**DETHMERS MANUFACTURING COMPANY, INC., Plaintiff,**

v.

**AUTOMATIC EQUIPMENT MFG. CO., Defendant.**

**No. C 96–4061–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Sept. 29, 1998.

David Tank, Davis, Brown, Koehn, Shors & Roberts, P.C., Brian J. Laurenzo, Michael Gilchrist, Dorsey & Whitney, LLP, Des Moines, IA, for Dethmers Manufacturing Co., Inc.

Warren M. Haines II, Donald R. Schoon-over, Lathrop & Gage, L.C., Kansas City, MO, Tim Engler, Harding, Shultz & Downs, Lincoln, NE, for Automatic Equipment Manufacturing Co.

**MEMORANDUM OPINION AND ORDER REGARDING. DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT, FOR MORE DEFINITE STATEMENT, AND TO STRIKE; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY; AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, District Judge.

I. *INTRODUCTION* ................................................................ 981
 A. *Procedural Background* ................................................ 981
 B. *Factual Background* .................................................... 983
 1. *The '166 patent* .................................................. 984
 2. *The Re482 patent* ................................................ 988
 a. *The '240 patent* ............................................. 988
 b. *The reissue patent* .......................................... 991
 3. *The "Parent Invention"* ......................................... 993
 4. *The Dethmers tow bar* .......................................... 994
 5. *Other products and allegations of infringement* ................. 997

II. *LEGAL ANALYSIS* ........................................................... 998
 A. *Which Circuit's Law?* .................................................. 998
 B. *Automatic's Motion To Dismiss* ........................................ 999
 1. *Punitive damages on state-law claims* .......................... 1000
 a. *Rule 12(b)(6) or Rule 56 standards?* ....................... 1000
 b. *Conflict-of-laws rules* ...................................... 1001
 c. *Application of the rules* .................................... 1002
 i. *Contract and quasi-contract claims* ..................... 1002
 ii. *Tort claims* .......................................... 1004
 2. *Conversion of intangible ideas* ................................ 1005
 a. *Applicable standards* ....................................... 1005
 b. *Conversion of "intangible ideas"* ........................... 1006
 3. *The "statutory" misappropriation claim* ........................ 1007
 4. *The "misappropriation of intellectual property" claim* ......... 1008
 a. *Standards for a motion to strike* ........................... 1008
 b. *Redundancy* ................................................ 1009
 c. *Recognition of the cause of action* .......................... 1010
 5. *Summary* ...................................................... 1011

C. Standards For Summary Judgment In Patent Cases ..................... 1011
D. Automatic's Motion For Summary Judgment Of Patent Invalidity ......... 1014
 1. Adequacy of the "error" in the original patent ....................... 1014
 a. Standards for reissue patents ................................. 1015
 b. Application of the standards .................................. 1017
 2. The same invention .............................................. 1019
 a. The appropriate test ......................................... 1019
 b. Application of the test ....................................... 1020
 3. Defective declaration ............................................ 1020
 a. Requirements of the declaration .............................. 1021
 b. Sufficiency of the declaration ................................ 1022
 4. Summary ...................................................... 1026
E. Dethmers's Motion For Summary Judgment Of Patent Invalidity, Unenforceability, And Non–Infringement ................................. 1026
 1. Invalidity of the '166 patent ..................................... 1027
 a. Anticipation of claims 1 through 4 of the '166 patent .............. 1027
 b. Obviousness of claim 5 of the '166 patent ...................... 1028
 2. Unenforceability owing to inequitable conduct ...................... 1030
 a. Materiality .................................................. 1031
 b. Intent to deceive ............................................ 1031
 3. Non–infringement .............................................. 1032
 a. Literal and "doctrine of equivalents" infringement ................ 1032
 i. Rules of claim construction ............................ 1033
 ii. Literal infringement ................................... 1033
 iii. Doctrine of equivalents infringement ................... 1034
 b. The groove .................................................. 1036
 i. Claim interpretation and literal infringement ............. 1037
 ii. "Equivalents" infringement and estoppel ................ 1038
 c. The spring location .......................................... 1038
 i. Claim interpretation and literal infringement ............. 1039
 ii. "Equivalents" infringement and estoppel ................ 1039
 d. The cover ................................................... 1040
 i. Claim interpretation ................................... 1041
 ii. "Equivalents" infringement and vitiation of claim limitations ............................................. 1041
 4. Summary ...................................................... 1043

III. CONCLUSION .......................................................... 1044

The adage "the devil is in the details" perhaps applies with greater felicitousness to patent law than to any of the other arcane and abstruse areas of the law that might keep a federal judge awake at night. However, in addition to uniquely patent issues, this case also involves a number of peculiar questions of state law, including which state's law is applicable, whether under that state's law punitive damages are available on contract and tort claims, and what is the scope of state-law protection for unpatented ideas or inventions. The court must face these "devils" and, recognizing the details, render its best conclusions.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Dethmers Manufacturing Company, Inc., filed this action on June 26, 1996, seeking primarily a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, of non-infringement of a patent owned by defendant Automatic Equipment Manufacturing Company and declaratory, injunctive, and damages relief for Automatic's alleged infringement of one of Dethmers's patents. The patents in suit involve tow bars for towing an automobile behind a recreational vehicle and the parties make such tow bars based on their respective patents. Dethmers is an Iowa corporation with its principal place of business in Boyden, Iowa. Automatic is a

Nebraska corporation with its principal place of business in Pender, Nebraska.

Dethmers was granted leave to file an amended complaint on April 24, 1997, and leave to file a second supplemental amended complaint on November 20, 1997. Count I of the second supplemental amended complaint seeks declaratory judgment that the products Dethmers manufactures do not infringe one of Automatic's patents, specifically United States Patent No. 5,356,166 (the '166 patent or the Automatic patent), that the '166 patent is invalid and unenforceable, and that Automatic is without right or authority to threaten or to maintain suit against Dethmers for alleged infringement of the '166 patent. Count II seeks damages for, as well as injunctive and declaratory relief from, infringement by Automatic of Dethmers's own patent, United States Patent No. Re32,482 (the Re482 patent or the Dethmers reissue patent), which is a reissue of United States Patent No. 5,232,240 (the '240 patent or the Johnson patent), a patent Dethmers alleges it acquired from the successors in interest to the inventor, Andrew B. Johnson of Barton, North Dakota. Count III seeks compensatory and punitive damages and injunctive relief for Automatic's alleged breach of a contract with Dethmers, as the assignee of Richard A. Parent, not to produce products incorporating the "Parent Invention" without permission or payment of consideration. Count IV seeks compensatory and punitive damages and injunctive relief for "statutory" misappropriation by Automatic of a trade secret, the "Parent Invention." Count V is a comparable "common-law" claim of misappropriation of a trade secret, also seeking compensatory and punitive damages and injunctive relief. Count VI alleges conversion of the "Parent Invention" and seeks compensatory and punitive damages and injunctive relief. Count VII alleges misappropriation of the "intellectual property" of Dethmers, again identified as the "Parent Invention," and seeks compensatory and punitive damages and injunctive relief. Finally, Count VIII alleges unjust enrichment by Automatic as the result of its use of design concepts of the "Parent Invention" in its products, and seeks compensatory and punitive damages and injunctive relief.

Automatic answered Dethmers's original complaint on August 5, 1996, and asserted a counterclaim. Automatic answered the first amended complaint on May 29, 1997, again asserting a counterclaim. In its counterclaim, Automatic asserts that the '166 patent was duly and legally issued to Automatic and that Dethmers has engaged in continued intentional infringement of that patent. Automatic seeks a declaration that the '166 patent is valid and enforceable, an injunction permanently restraining Dethmers from infringing the '166 patent, an accounting and determination of profits from Dethmers's sales of infringing products, and damages trebled for willful infringement. Dethmers answered Automatic's counterclaim on June 9, 1997, and filed an amended reply to the counterclaim with its second supplemental amended complaint on November 20, 1997.

Instead of answering the second supplemental amended complaint, however, Automatic filed the first of the motions now before the court, its December 5, 1997, motion to dismiss or in the alternative for partial summary judgment, for more definite statement, and to strike. In that motion, Automatic seeks dismissal pursuant to FED. R.CIV.P. 12(b)(6) of, or in the alternative a grant of summary judgment pursuant to FED.R.CIV.P. 56 on, Dethmers's prayers for punitive damages on its state-law contract, quasi-contract, and tort claims, because punitive damages are prohibited under Nebraska law, the law Automatic argues is applicable to these claims under Iowa's conflict-of-laws or choice-of-law rules. Automatic also seeks dismissal of Count VI, Dethmers's conversion claim, pursuant to FED.R.CIV.P. 12(b)(6), on the ground that there can be no claim for conversion of intangible "ideas." Automatic prays for a more definite statement of Dethmers's "statutory" misappropriation claim in Count IV, because Dethmers has failed to identify or specify any statute upon which the claim is based. As the final part of this motion, Automatic seeks to have Dethmers's Count VII, the claim for misappropriation of "intellectual property," stricken as redundant of the "statutory" and "common-law" misappropriation claims in Counts IV and V and the conversion claim in Count VI.

Next, on March 11, 1998, Automatic filed a motion for summary judgment on the invalidity of the Dethmers reissue patent, the Re482 patent. Automatic asserts that the alleged "error" in the original patent asserted by Dethmers in seeking the reissuance is not of the kind that justifies the granting of a reissue patent. Automatic also asserts that the Re482 patent is not for the same general invention as the original '240 patent, the Johnson patent. Finally, Automatic contends that the required declaration of the inventor or his representative in support of the application for a reissue patent is fatally defective. Therefore, Automatic seeks summary judgment on Count II of Dethmers's second supplemental amended complaint, which asserted Automatic was infringing the Re482 patent.

The last of the motions now before the court was filed by Dethmers on June 2, 1998. In that motion, Dethmers seeks summary judgment or in the alternative partial summary judgment. Dethmers asserts that it is entitled to summary judgment that it is not infringing Automatic's '166 patent on three grounds. First, Dethmers asserts that the patent is invalid, because claims 1 through 4 of the patent were anticipated by a latching device made by Weasler Engineering, and claim 5 of the patent is obvious in light of prior art including the Weasler device. Second, Dethmers contends that the '166 patent is unenforceable because of inequitable conduct of Automatic in withholding reference to the Weasler device from the patent examiner. Third, Dethmers contends that, even if the '166 patent is valid and enforceable, Dethmers's products do not infringe the limitations of the claims in the '166 patent. Therefore, Dethmers seeks declaratory judgment that Dethmers does not infringe the '166 patent and summary judgment denying Automatic's counterclaim for infringement of the '166 patent.

All resistances and replies have now been filed to these three pending motions and the court heard oral arguments on the motions on September 22, 1998. Plaintiff Dethmers Manufacturing Company, Inc., was represented at the oral arguments by counsel David Tank of Davis, Brown, Koehn, Shors & Roberts, P.C., who argued the motions for Dethmers, and by counsel Brian J. Laurenzo

and Michael Gilchrist of Dorsey & Whitney, LLP, in Des Moines, Iowa. Defendant Automatic Equipment Manufacturing Company was represented at the oral arguments by counsel Warren M. Haines II, who argued the patent motions, and counsel Donald R. Schoonover of Lathrop & Gage, L.C., in Kansas City, Missouri, and by counsel Tim Engler of Harding, Shultz & Downs in Lincoln, Nebraska, who argued the state-law motions. The arguments and briefing were of exceptional quality and very illuminating.

### B. Factual Background

The court will discuss here only the nucleus of facts pertinent to the present motions to dismiss and for summary judgment or partial summary judgment. In its legal analysis, the court will address where necessary the parties' arguments concerning the correct treatment of factual allegations or their assertions of genuine issues of material fact, which the parties contend are dispositive of the motions now before the court.

As mentioned above, both parties make tow bars, based on their respective patents, for towing an automobile behind a recreational vehicle. The court will focus here primarily on a description of the patents or inventions, and products embodying them, at issue in this lawsuit. However, to put those discussions in context, the court begins with some general observations. Until the 1990s, the parties appear to agree, most tow bars for towing another smaller vehicle behind a recreational vehicle (RV) used a conventional ball hitch on the RV and the tow bar itself remained attached to the towed vehicle, or could be detached only with some difficulty. To improve the safety of towing another vehicle and to improve the ease with which tow bars could be used, various makers developed a new generation of tow bars that replaced ball hitches with receiver hitches and, more importantly here, were designed to fold up easily on the RV when not in use, thus leaving the towed vehicle unencumbered for use. These new generation tow bars generally have two adjustable arms that are extended from the hitch to the front end of the towed vehicle, where they are attached by one means or another for towing. The arms, however, can be telescoped or folded,

then folded up against the RV, for storage when not in use.

### 1. The '166 patent

The first tow bar patent at issue in this case is one of Automatic's patents, specifically, United States Patent No. 5,356,166, referred to in this litigation as the '166 patent. This patent is for an "Arrestably Lockable Telescoping Tow–Bar Assembly." It was applied for on July 12, 1993, and issued on October 18, 1994. It shows the inventors as Merton K. Hahne and William A. Bachman, and the assignee as Automatic Equipment Mfg. Co., of Pender Nebraska. Both Hahne and Bachman are engineers employed by Automatic. Figures 3 and 5 of the patent show the tow bar in its folded and towing positions, respectively:

*FIG. 3*

FIG. 5

*See, e.g.,* Plaintiff's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment or in the Alternative Partial Summary Adjudication, Exhibit 2 (United States Patent No. 5,356,166) (hereinafter Patent No. '166), Figs. 3 & 5.

The Abstract of the patent describes the invention as follows:

An improved locking mechanism for an arrestably lockable telescoping tow bar assembly comprises a slidable latch member surrounding balls-containing sideward openings of an outer tube that are radially alignable with an outside groove of a telescopingly associated inner tube, the slidable latch member including a medial cam portion slidably surrounding the outer tube between a surrounding retainer ring augmentation therefor and the balls-containing sideward openings therefor; a cover slidably surrounding a trailward part of the slidable latch member and being trailwardly immovable along the outer tube; and a helical spring means actuatably ex-

tending between the cover member and the slidable latch member.
Patent No. '166, p. 1. The "improved locking mechanism" of the tow bar assembly, the focus of this litigation, is shown in Figures 1 and 2, which show the "unlocked" and "locked" positions, respectively.

FIG. 1

FIG. 2

Patent No. '166, Figs. 1 & 2. As can be seen from these figures, the telescoping inner tube (# 20) is locked in place when the "balls" (# 36) align with the "outside groove" (# 25) on the inner tube and the balls are pushed down into the groove by the "cam" (# 40), which is in turn pushed into the locking position by the "helical spring" (# 60).

■■■■ The claimed invention consists of five claims, only the first of which is "independent," and all the rest of which are "de-

pendent" upon claim **1**.[1] In the words of the patent,

What is claimed is as follows:

**1.** Arrestably Lockable Telescoping Tow–Bar Assembly comprising:

(A) an inner-tube having an outer-surface concentrically surrounding a directionally longitudinally extending central-axis and having a trail-end directionally transversely intersecting said central-axis, said outer-surface being provided with at least one radially inwardly extending inward-groove circularly surrounding said central-axis and located in a plane perpendicular to said central-axis;

(B) an outer-tube having a leadward-end directionally transversely intersecting said central-axis and having an outward-surface surrounding said central-axis and an inward-surface slidably surrounding said inner-tube outward-surface, said outer-tube being provided with a finite-plurality of equiangularly-spaced sideward-openings there-through that are radially and directionally transversely alignable with said inner-tube's outer-surface inward-groove, each said sideward-opening being provided with a spherical ball whose diameter slightly exceeds the radial dimension between the outer-tube outward-surface and inward-surface, and said outer-tube between a leadward-end thereof and said transversely aligned balls-provided sideward-openings being externally provided with a retainer ring that surrounds and extends directionally radially outwardly beyond said outer-tube outward-surface;

(C) a slidable latch member permanently surrounding said outer-tube balls-provided sideward-openings and including a leadward-part and a trailward-part radially outwardly spaced from the outer-tube outward-surface and further including a medially-located cam portion permanently located trailwardly of said retainer ring and slidably surrounding said outer-tube outward-surface;

(D) a cover having a leading-part slidably surrounding the slidable latch member trailward-part and being directionally trailwardly immovably restrained along the outer-tube; and

(E) helical spring means surrounding the outer-tube and actuatably extending directionally longitudinal between the cover member and the slidable latch member medially-located cam portion.

**2.** The assembly of claim **1** wherein a cover trailward-part immovably abuts an upright-shoulder portion of the outer-tube.

**3.** The assembly of claim **2** wherein the helical spring means actuatably extends between the slidable latch member medial cam portion and a said cover member's immovably restrained trailward-part.

**4.** The assembly of claim **1** wherein the retainer ring is located at said radially extending and transversely aligned array of outer-tube sideward-openings; and wherein said sideward-openings are spaced at equal angular increments about said externally grooved portion of the inner-tube.

**5.** The assembly of claim **3** wherein the outer-tube inward-surface includes a trailward-surface portion that is spaced radially outwardly away from the inner-tube outer-surface; and wherein the inner-tube at the trail-end thereof is provided with a centrally-perforate-washer flange means

---

1. Each claim of a patent is an independent invention, *see Laitram Corp. v. NEC Corp.*, 62 F.3d 1388, 1392 (Fed.Cir.1995); however, a "dependent" claim contains all the limitations of the "independent" claim from which it depends. *See, e.g., Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989). In other words, an "independent" claim states its invention without reference to any other claim, while a "dependent" typically begins with a formula such as "the assembly of claim 1 wherein ..." indicating from which numbered claim it depends. "One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true. One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Wahpeton Canvas Co., Inc.*, 870 F.2d at 1552 n. 9.

extending radially outwardly from the inner-tube outer-surface but which flange means is surrounded by the outer-tube trail-ward-surface, whereby there is provided a "safety means" between the telescoping inner-tube and outer-tube.

Patent No. '166, cols. 4–6. The inspiration for and patent history of this invention will be discussed as required in the court's legal analysis below.

### 2. The Re482 patent

The second patent in suit is one of Dethmers's patents, specifically United States Patent No. Re32,482, which is referred to in this litigation as the Re482 patent or the Dethmers reissue patent. Because it is a "reissue" patent, it is first necessary to discuss the original patent upon which the Re482 patent is based, United States Patent No. 5,232,240, referred to herein as the '240 patent or the Johnson patent.

#### a. The '240 patent

Dethmers acquired the Johnson patent from the successors in interest to the inventor, Andrew B. Johnson of Barton, North Dakota. Those successors in interest were Andrew Johnson's widow and brother. This patent is for a "Towing Hitch." It was applied for on October 29, 1992, and issued on August 3, 1993, and shows the inventor as Andrew B. Johnson, with no assignee. Figures 1 and 4 of the patent show the tow bar in its towing and folded positions, respectively:

FIG. 1

FIG. 4

*See, e.g.,* Defendant's Evidence in Support of Statement of Uncontroverted Material Facts, Volume I, Deposition Exhibit No. 2 (United States Patent No. 5,232,240) (hereinafter Patent No. '240), Figs. 1 & 4.

The Abstract of the '240 patent describes the invention as follows:

A towing hitch includes a frame having a forward portion selectively connected to the receiver hitch of a towing vehicle, and

a rearward portion having a pair of elongated bars pivotally connected thereto for removable connection to a vehicle to be towed. Each bar has a pivot arm connected to the rearward end thereof, said pivot arms and bars all pivotal within a single plane, so that the pivot arms may be folded into a storage position adjacent and parallel the bars. Selective locking apparatus permits the pivot arms to be extended to a towing position aligned with the bars and locked in the towing position. The bars are pivotally connected to a pivot block which is pivotally mounted to the forward portion of the frame, so as to permit the pivot block, and attached bars and arms to pivot from a generally horizontal position to a generally vertical storage position. The pivot block is mounted on a rotatable yoke, such that the bars and pivot arms are rotatable, as a unit, along an axis parallel to the direction which a vehicle is being towed.

Patent No. '240, p. 1.

The claimed invention consists of three claims, only the first of which is "independent," and the rest of which are "dependent" upon claim 1. In the words of the patent,

I claim:

1. A towing hitch, comprising:

a frame having a forward position for selective removable connection to a towing vehicle, and a rearward portion for selective removable connection to a vehicle to be towed;

said forward portion including a generally horizontal forwardly extending member adapted for selectively lockable receipt within a conventional receiver hitch;

said rearward portion including first and second elongated bars having forward and rearward ends, the forward ends of said bars pivotally connected to a pivot bolt for pivotal movement within the same plane about said pivot bolt;

a first pivot arm pivotally connected at a forward end to the rearward end of said first bar for pivotal movement coplanar with said first and second bars;

a second pivot arm pivotally connected at a forward end to the rearward end of said second bar for pivotal movement coplanar with said first and second bars;

connection means connected to rearward ends of said pivot arms for selective removable connection to a vehicle to be towed;

means connected to said first pivot arm and first bar for selectively locking said first pivot arm and first bar in axial alignment;

means connected to said second pivot arm and second bar for selectively locking said second pivot arm and second bar in axial alignment;

said rearward portion further including a pivot block having upper and lower surfaces, forward and rearward ends, and opposing side surfaces, pivotally connected to said forward portion on a generally horizontal pivot axis extending through said side surfaces of the pivot block;

said pivot bolt being mounted through the upper and lower surfaces of said pivot block, pivot axis, so as to pivot with said pivot block;

said pivot block connected for pivotal movement between a storage position, wherein the pivotal plane of the arms and bars is generally vertical, and a towing position, wherein the pivotal plane of the arms and bars is generally horizontal.

2. The hitch of claim 1, further comprising means on said forward portion for selectively locking said pivot block in storage position.

3. The hitch of claim 1, wherein said pivotal connection of the pivot block to the forward portion further comprises:

a pin having forward and rearward ends, rotatably connected to said forward portion for free rotatable movement about the pin's longitudinal axis;

a pair of spaced-apart, parallel arms projecting rearwardly from the rearward end of said pin;

said arms for pivotal movement within a plane parallel to said arms and about an axis perpendicular to the rotational axis of said pin.

Patent No. '240, cols. 5–6.

### b. The reissue patent

The Re482 patent is a reissue of the Johnson patent. It was applied for on March 24, 1995, and issued on March 25, 1997. It shows the inventor as Andrew B. Johnson, deceased, and that the application was filed by Arline Johnson, Legal Representative. The assignee of the Re482 patent is Dethmers. Dethmers prosecuted the Re482 patent after obtaining the rights to the Johnson patent from the inventor's successors in interest, his widow and his brother.

The declaration on behalf of the inventor states that the basis for the application for a reissue patent was that "the original patent [was] partly invalid because of errors without any deceptive intent on the part of Johnson. The errors were in Johnson's claiming less than he had a right to claim in the patent." Defendant's Evidence in Support of Statement of Uncontroverted Material Facts, Vol. 1, Deposition Exhibit No. 2, Substitute Reissue Application Declaration on Behalf of Inventor by Personal Representative (hereinafter Substitute Reissue Application Declaration), p. 2 (Bates stamp p. 000707).[2] Consequently, the Abstract to the Re482 patent is identical to that of the '240 patent, with but one exception: At the end of the second sentence, a missing "to" has been inserted between "parallel" and "the bar." However, the claims of the Re482 patent have been significantly altered.[3]

Those alterations of the claims include both deletions and additions. First, in claim 1 of the '240 patent, the fourth through eighth indented paragraphs have been deleted in their entirety.[4] In the last of the indented paragraphs of claim 1, the words "arms and" have been deleted both times they appear. The language of claims 2 and 3 has not been altered in any way, but those claims are now dependent upon a different independent claim 1: they are dependent on a claim with no pivot arms. New claims 4 through 10 have been added to the reissue patent. Those additions state the following:

4. The hitch of claim 1, further comprising:

a first pivot arm having a forward end and a rearward end, said first pivot arm pivotally connected at said forward end to the rearward end of said first bar for pivotal movement coplanar with said first and second bars; and

a second pivot arm having a forward end and a rearward end, said second pivot arm pivotally connected at said forward end to the rearward end of said second bar for pivotal movement coplanar with said first and second bars; and

connection means connected to said rearward ends of said pivot arms for selective removable connection to said vehicle to be towed.

5. The hitch of claim 4, further comprising:

means connected to said first pivot arm and first bar for selectively locking said first pivot arm and first bar in axial alignment; and

means connected to said second pivot arm and second bar for selectively locking said second pivot arm and second bar in axial alignment.

6. A towing hitch, comprising:

---

2. A more detailed discussion of the reissue application process will be appropriate below with regard to Automatic's assertion that the Substitute Reissue Application Declaration was fatally defective.

3. New figures were also included in the Re482 patent. However, it does not appear necessary to the court to reproduce those figures in this ruling.

4. To be precise, these paragraphs appear in the Re482 patent in heavy brackets, as does other language described by the court here as "deletions," while language the court has described as "additions" or "new" appears in the Re482 patent in italics. According to the prefatory paragraph of the Re482 patent,

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

a frame having a forward portion for selective removable connection to a towing vehicle, and a rearward portion for selective removable connection to a towing vehicle, and a rearward portion for selective removable connection to a vehicle to be towed;

said forward portion including a generally horizontally forwardly extending member adapted for selectively lockable receipt within a conventional receiver hitch;

said rearward including first and second elongated bars having forward and rearward ends, the forward ends of said bars pivotally connected to a pivot bolt for pivotal movement within the same plane about said pivot bolt;

said rearward portion further including a pivot member having upper and lower surfaces, forward and rearward ends, and opposing side surfaces, pivotally connected to said forward portion on a generally horizontal pivot axis extending through said side surfaces of the pivot member;

said pivot bolt being mounted through the upper and lower surfaces of said pivot member rearwardly of and perpendicular to the pivot member pivot axis, so as to pivot with said pivot member;

said pivot member connected for pivotal movement between a storage position, wherein the pivotal plane of the bars is generally vertical, and a towing position, wherein the pivotal plane of the bars is generally horizontal.

7. A towing hitch, comprising:

a frame having a forward portion for selective removable connection to a towing vehicle, and a rearward portion for selective removable connection to a vehicle to be towed;

said forward portion including a generally horizontal forwardly extending member adapted for selectively lockable receipt within a conventional receiver hitch;

said rearward portion including first and second elongated bars having forward and rearward ends, the forward ends of said bars pivotally connected to a pivot bolt for pivotal movement within the same plane about said pivot bolt;

said rearward portion further including pivot means for pivotal movement of said rearward portion about a transverse horizontal axis, said transverse horizontal axis located forwardly of and perpendicular to said pivot bolt, said pivot means allowing for pivotal movement of said rearward portion between a storage position, wherein the pivotal plane of the bars is generally vertical, and a towing position, wherein the pivotal plane of the bars is generally horizontal.

8. A towing hitch, comprising:

a frame having a forward portion for selective removable connection to a towing vehicle, and a rearward portion for selective removable connection to a vehicle to be towed;

said forward portion including a generally horizontal forwardly extending member adapted for selectively lockable receipt within a conventional receiver hitch;

said rearward portion including first and second elongated bars having forward and rearward ends, the forward ends of said bars pivotally connected to a pivot bolt for pivotal movement within the same plane about said pivot bolt;

a first pivot arm pivotally connected at a forward end to the rearward end of said first bar for pivotal movement coplanar with said first and second bars;

a second pivot arm pivotally connected at a forward end to the rearward end of said second bar for pivotal movement coplanar with said first and second bars;

connection means connected to rearward ends of said pivot arms for

selective removable connection to a vehicle to be towed;

means connected to said first pivot arm and first bar selectively locking said first pivot arm and first bar in axial alignment;

means connected to said second pivot arm and second bar for selectively locking and second pivot arm and second bar in axial alignment;

said rearward portion further including a pivot block having upper and lower surfaces, forward and rearward ends, and opposing side surfaces, pivotally connected to said forward portion on a generally horizontal pivot axis extending through said side surface of the pivot block;

said pivot block being mounted through the upper and lower surfaces of said pivot block, rearwardly of and perpendicular to the pivot block pivot axis, so as to pivot with said pivot block;

said pivot block connected for pivotal movement between a storage position, wherein the pivotal plane of the arms and bars is generally vertical, and a towing position, wherein the pivotal plane of the arms and bars is generally horizontal.

9. The hitch of claim 8, further comprising means on said forward portion for selectively locking said pivot block in storage position.

10. The hitch of claim 8, wherein said pivotal connection of the pivot block to the forward portion further comprises:

a pin having forward and rearward ends, rotatably connected to said forward portion for free rotatable movement about the pin's longitudinal axis;

a pair of spaced-apart, parallel arms projecting rearwardly from the rearward end of said pin;

said arms for pivotal movement within a plane parallel to said arms and about an axis perpendicular to the rotational axis of said pin.

\* \* \* \* \* \*

Defendant's Evidence in Support of Statement of Uncontroverted Material Facts, Vol. 1, Deposition Exhibit No. 2, United States Patent No. Re32,482 (hereinafter Patent No. Re482). Thus, the new claims, *inter alia*, reintroduce the pivot arms as independent claims.

### 3. The "Parent Invention"

The figure who stands at the nexus between Automatic's and Dethmers's development of new generation tow bars is Richard Parent. Parent, described by Automatic as "something of a nomad," first approached employees of Automatic in 1993 with an idea for a tow bar that was designed to be mounted on the back of an RV and utilized a swivel or universal joint. Parent had sketched rough drawings of his "invention" and showed them to Bachman, an employee of Automatic, in February 1993. Parent's invention was of interest to Bachman because he was then developing the design for the locking device for telescoping tow bar arms that later became part of the '166 patent. Bachman and Parent were both interested in jointly developing a tow bar incorporating their ideas.

After the meeting between Bachman and Parent, Automatic worked to reduce their ideas to practice, eventually building a prototype of a tow bar with a locking device for telescoping arms and a swivel or universal flex joint. Automatic then refined the design and eventually marketed the tow bar, under the name AVENTA, in 1994. Although Parent and Automatic negotiated over an agreement for sales of the AVENTA tow bar for some time, five months after that tow bar was introduced into the market, according to Automatic, Parent and Automatic "decided to go their separate ways."

Parent then approached Dethmers to see if Dethmers was interested in developing a tow bar design incorporating his invention. Although Dethmers was interested, Dethmers first pursued a patent search that led it to the Johnson patent, which in turn led to Dethmers's acquisition of that patent. Thereafter, in the summer and fall of 1994, Dethmers and Parent negotiated and ultimately finalized a "Patent Assignment–Royalty Agreement." In that assignment, Parent assigned his inventorship of a "Tow Bar Having A Self Aligning Joint and Telescopic 'SQUARE' Legs." Dethmers began fabri-

cating a tow bar based at least in part on the Parent invention in the fall of 1994.

### 4. The Dethmers tow bar

The next invention or product the court must consider is the Dethmers tow bar, because only its infringement or non-infringement of the Automatic patent is at issue in one of the motions now pending before the court. In contrast, the defense Automatic mounts in its summary judgment motion to Dethmers's claims of infringement go to the invalidity of the patent, not to the absence of a genuine issue of material fact that its product does not infringe the Dethmers patent. Therefore, the court will only discuss the Dethmers tow bar of the products actually marketed by the parties, and that only briefly.

The accused device is shown in the following illustrations in assembled and "exploded" form:

The locking mechanism of the accused device, the part that is principally at issue here, is shown below in "cut-away" views in figures 4a and 4ba, and in "cross-sectional" views in figures 6a and 6b:

FIG. 4a

FIG. 4b

FIG. 6a

FIG. 6b

As portrayed in these illustrations, the Dethmers tow bar, like that described in the '166 patent, employs a swivel hitch and adjustable, telescoping arms. Whether and to what extent the accused device may be infringing, however, will be considered in the court's legal analysis.

### 5. Other products and allegations of infringement

Like Dethmers, Automatic currently make tow bars, but the court need do no more than mention them here, because their elements are not currently at issue. Automatic's tow bars include the Blue Ox line of tow bars, which employed a traditional ball/coupler hitch. More pertinent here, however, are Automatic's "new generation" tow bars, including the AVENTA tow bar developed after Bachman's contact with Richard Parent, which uses a swivel or universal flex joint and locking telescoping arms, the AVENTA II tow bar, and the PATRIOT, KAR–BAR, and ALADDIN tow bars.

In this litigation, each of the parties accuses the other, *inter alia,* of infringing its patent. In the fall of 1994, Dethmers notified Automatic of the existence of the John-

son patent and accused Automatic of infringement. Dethmers's complaint in this litigation, filed on June 26, 1996, alleges infringement of the Re482 patent by Automatic's AVENTA, AVENTA II, PATRIOT, KAR–BAR, and ALADDIN tow bars. In August of 1995, Automatic notified Dethmers of the '166 patent. In its counterclaim, filed on May 29, 1997, Automatic alleges that Dethmers's EXCALI–BAR tow bar infringes Automatic's '166 patent. In due course, Automatic filed its motion to dismiss or for partial summary judgment on state-law questions and the parties filed their respective motions for summary judgment on issues of patent validity, enforceability, and/or infringement.

## II. LEGAL ANALYSIS

### A. Which Circuit's Law?

Before considering the pending dispositive motions, it is perhaps well to establish which circuit's law is applicable to what, particularly where not all of the issues in this "patent" case are questions of "patent" law. The Federal Circuit Court of Appeals has repeatedly held that if issues are not unique to its exclusive jurisdiction—such as appeals of patent law issues—it will defer to the law of the regional circuit in which the district court sits. *See, e.g., Oddzon Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1407 (Fed.Cir. 1997) ("Because trade dress issues are not unique to the exclusive jurisdiction of this court, we defer to the law of the regional circuit in which a district court sits."); *Pro–Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574 (Fed.Cir.1996) ("When considering issues which are not unique to our jurisdiction we defer to the law of the regional circuit. When the issues involve substantive questions within our exclusive jurisdiction, however, we do not defer to the regional circuit"; citations omitted); *Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1578 (Fed.Cir.1995) (trade dress issues called for application of regional circuit's law, *i.e.,* the law of the Eleventh Circuit Court of Appeals); *Imagineering, Inc. v. Van Klassens, Inc.,* 53 F.3d 1260, 1263 (Fed.Cir.) (same), *cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995); *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1200 (Fed.Cir. 1994) (Lanham Act claims called for applica-

tion of Eighth Circuit law), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *Mars, Inc. v. Kabushiki–Kaisha Nippon Conlux,* 24 F.3d 1368, 1371 (Fed.Cir. 1994); *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1447–48 (Fed. Cir.1993); *Jurgens v. McKasy,* 927 F.2d 1552, 1563 n. 6 (Fed.Cir.) (applying Eighth Circuit law to issues of unfair competition over which the Federal Circuit Court of Appeals did not have exclusive jurisdiction), *cert. denied,* 502 U.S. 902, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991).

In *Mars, Inc.,* the Federal Circuit Court of Appeals clarified when deference to the regional circuit's law is appropriate and when it is not:

> When an issue before us pertains to a matter not unique to our exclusive appellate jurisdiction, our established practice has been to defer to the discernable law of the regional circuit in which the district court sits. Such deference, however, is inappropriate when an issue involves substantive questions coming exclusively within our jurisdiction, the disposition of which would have a direct bearing on the outcome.
>
> In this case, review of the propriety of the district court's dismissal for lack of jurisdiction necessarily requires consideration of facts and resolution of legal principles that bear an essential relationship to matters committed to our exclusive control. The issue whether the district court had jurisdiction to hear Mars' claim of Japanese patent infringement is of importance to the development of the patent law and is clearly a matter that falls within the exclusive subject matter responsibility of this court. Thus, we are not bound by the law of the [regional] circuit in deciding this case. Notwithstanding that conclusion, [w]e may, of course, look for guidance in the decisions of the [regional circuit], as well as those of other courts.

*Mars, Inc.,* 24 F.3d at 1371 (internal citations and quotation marks omitted). However, a prior decision makes clear that Federal Circuit law is not necessarily applicable to *any* subject matter jurisdiction challenge in a patent case. *See Cedars–Sinai Med. Ctr. v.*

*Watkins,* 11 F.3d 1573, 1580 (Fed.Cir.1993) (dismissal pursuant to FED.R.CIV.P. 12(b)(1) on "ripeness" grounds required application of the regional circuit's law, because Federal Circuit law governs review of a decision to dismiss a patent infringement suit only when justiciability of the controversy is not in question), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994). Nor is a simple dichotomy between "procedural matters," governed by the regional circuit's law, and "substantive matters," governed by Federal Circuit law, appropriate, because even "procedural" matters may involve questions that fall within the Federal Circuit's exclusive jurisdiction. *See, e.g., Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.,* 12 F.3d 1080, 1082 (Fed.Cir.1993) (a Rule 60(b) ruling is generally considered under the law of the regional circuit, "because such rulings commonly involve procedural matters that are not unique to patent law," but the Federal Circuit applied its own law in this case, "because our review of the district court's Rule 60(b) ruling turns on substantive matters that are unique to patent law"); *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.,* 998 F.2d 985, 987 (Fed.Cir.1993) ("As a general rule, we review procedural matters under the law of the regional circuit in which the district court sits," and "[a]dditionally, we defer to the law of the regional circuit when addressing substantive legal issues over which we do not have exclusive subject matter jurisdiction," and applying Tenth Circuit law to issuance of a preliminary injunction in a trademark case); *Wang Labs., Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355, 357 (Fed.Cir.1992) (generally, on procedural matters, the Federal Circuit follows the law of the regional circuit, but it will not do so on issues of its own appellate jurisdiction, although it may look for guidance to the law of the regional circuit). Rather, the test, as stated in *Mars, Inc.,* is whether the question presented "necessarily requires consideration of facts and resolution of legal principles that bear an essential relationship to matters committed to [the Federal Circuit's] exclusive control." *Mars, Inc.,* 24 F.3d at 1371.

In this case, the court concludes that the first of the dispositive motions— Automatic's December 5, 1997, motion to dismiss or in the alternative for partial sum-

mary judgment, for more definite statement, and to strike—does not "necessarily require[ ] consideration of facts and resolution of legal principles that bear an essential relationship to matters committed to [the Federal Circuit's] exclusive control." *Id.* Indeed, the substantive questions presented are entirely matters of *state* law, to wit, whether punitive damages are available on certain state-law claims, whether a state-law conversion claim will lie, and whether certain state-law claims are adequately pleaded or are redundant of other state-law claims. Furthermore, *which* state's law applies is also a question of state law, as it must be resolved according to Iowa's choice-of-law or conflict-of-laws rules. *See Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400, 1403–04 (N.D.Iowa 1995) (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.,* 137 F.3d 560, 561–62 (8th Cir. 1998) (" 'Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship,' " quoting *Whirlpool Corp. v. Ritter,* 929 F.2d 1318, 1320 (8th Cir.1991)); *Penney v. Praxair, Inc.,* 116 F.3d 330, 333 n. 4 (8th Cir.1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits . . . ."). Thus, the standards of the Eighth Circuit Court of Appeals apply to the procedural requirements for this first motion to dismiss or for summary judgment and Iowa law applies to the substantive questions. On the other hand, the parties' motions for summary judgment to declare each other's patents invalid, unenforceable, infringed or not infringed, plainly fall within the exclusive jurisdiction of the Federal Circuit Court of Appeals and this court will therefore apply Federal Circuit law to those issues.

### B. *Automatic's Motion To Dismiss*

Automatic's December 5, 1997, motion to dismiss or in the alternative for partial summary judgment, for more definite statement, and to strike first seeks dismissal pursuant to FED.R.CIV.P. 12(b)(6) of, or in the alternative a grant of summary judgment pursuant to FED.R.CIV.P. 56 on, Dethmers's prayers

for punitive damages on Dethmers's state-law contract, quasi-contract, and tort claims, on the ground that punitive damages are prohibited under Nebraska law. Automatic also seeks dismissal of Count VI, Dethmers's conversion claim, pursuant to FED.R.CIV.P. 12(b)(6), on the ground that there can be no claim for conversion of intangible "ideas." Automatic prays for a more definite statement of Dethmers's "statutory" misappropriation claim in Count IV, because Dethmers has failed to identify or specify any statute upon which the claim is based. As the final part of this motion, Automatic seeks to have Dethmers's Count VII, the claim for misappropriation of "intellectual property," stricken as redundant of the "statutory" and "common-law" misappropriation claims in Counts IV and V and the conversion claim in Count VI.

### 1. Punitive damages on state-law claims

The first part of Automatic's motion—which seeks dismissal or summary judgment on Dethmers's prayer for punitive damages on state-law claims, because Nebraska law prohibits punitive damages on such claims—is brought pursuant to FED.R.CIV.P. 12(b)(6), or, in the alternative, pursuant to FED. R.CIV.P. 56. Dethmers contends that, treated as a motion to dismiss, the court must assume its allegations that Nebraska law does not apply are true.[5] Noting that Automatic has attached various matters outside of the pleadings to its motion that are pertinent to punitive damages issues, Dethmers also contends that, if the court converts the motion into one for summary judgment, there are genuine issues of material fact as to whether Nebraska law would apply. Dethmers asserts that there are other candidates for the applicable law, because discussions between Parent and Automatic concerning the "Parent Invention" took place in California and Nevada, as well as Nebraska. Automatic's rejoinder is that Nebraska is still the state with "the most significant relationship," even if other states were the locale of some of its discussions with Parent.

### a. Rule 12(b)(6) or Rule 56 standards?

Where on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." FED.R.CIV.P. 12(b)(6); see also Buck v. FDIC, 75 F.3d 1285, 1288 & n. 3 (8th Cir.1996) (because the district court relied on matters outside the complaint in ruling on a Rule 12(b)(6) motion, "the district court had to treat the [defendant's] motion to dismiss as a motion for summary judgment and apply the relevant standards for summary judgment," and further noting that "[t]he standards for dismissing a complaint under Rule 12(b)(6) are substantially different" from those applicable to a Rule 56 summary judgment motion; therefore it was inappropriate for the district court to fail to specify whether it was disposing of an issue according to summary judgment or Rule 12(b)(6) standards). Even where matters outside of the pleadings are presented to the court, however, a motion to dismiss is not converted into a motion for summary judgment "where the district court's order makes clear that the judge ruled only on the motion to dismiss." Skyberg v. United Food and Commercial Workers Int'l Union, AFL–CIO, 5 F.3d 297, 302 n. 2 (8th Cir.1993). Where the district court has made the posture of its disposition clear, the appellate court will "treat the case as being in that posture." Id.

The court concludes that it is not necessary to "convert" this portion of Automatic's motion to dismiss into a motion for summary judgment, because Automatic has already couched its motion in the alternative as one for summary judgment pursuant to Rule 56. Thus, Dethmers had notice from the time the motion was filed that the court was being asked to adjudicate the matters presented according to summary judgment standards, and Dethmers has responded in kind by arguing for denial of the motion

---

**5.** In its resistance to this motion, Dethmers frequently misstates the question to be whether Nebraska's choice-of-law rules apply. As shall be explained below, Iowa's, not Nebraska's, conflict-of-laws or choice-of-law rules apply to the question of whether Nebraska's law on punitive damages is applicable to Dethmers's state-law claims.

according to those standards. In these circumstances, it is appropriate for the court to treat the motion, in the first instance, as one for summary judgment, FED.R.CIV.P. 12(b)(6) (where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"), and the court will proceed accordingly. *See Skyberg,* 5 F.3d at 302 n.2 (where the district court has made the posture of its disposition clear, the appellate court will "treat the case as being in that posture").

This court has considered in some detail the Eighth Circuit standards applicable to motions for summary judgment pursuant to FED.R.CIV.P. 56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. #1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(b), (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. With these standards in mind, the court turns to consideration of Automatic's motion for summary judgment on Dethmers's prayer for punitive damages on its state-law claims, because punitive damages are not available on such claims under Nebraska law.

### b. Conflict-of-laws rules

The court has confronted the often knotty problem of what law applies to specific common-law claims in a diversity action a number of times in recent years. *See Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F.Supp. 1445, 1458 (N.D.Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400 (N.D.Iowa 1995); *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1251–54 (N.D.Iowa 1995). To resolve the issue of which state's law applies to Dethmers's common-law claims, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-law rules. *Harlan Feeders, Inc.,* 881 F.Supp. at 1403–04 (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.,* 137 F.3d 560, 561–62 (8th Cir.1998) ("'Federal district courts must apply the choice-of-law rules of

the state in which they sit when jurisdiction is based on diversity of citizenship,' " quoting *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir.1991)); *Penney v. Praxair, Inc.*, 116 F.3d 330, 333 n. 4 (8th Cir.1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits. . . .").

 However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Id.* at 1404; *accord Phillips v. Marist Soc'y of Washington Province*, 80 F.3d 274, 276 (8th Cir.1996) ("We agree with the statement of Judge Richard A. Posner that 'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir.), *cert. denied*, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992)." Where there was no "true conflict," the court did not engage in a choice-of-law analysis, and simply applied the law of the forum.). In *Harlan Feeders*, this court concluded that there is indeed a "true conflict" between Nebraska's prohibition of punitive damages, pursuant to its constitution, and Iowa's establishment by statute and common law of the availability and substantive requirements for punitive damages. *Harlan Feeders*, 881 F.Supp. at 1404–05. Furthermore, in *Harlan Feeders*, this court concluded that the availability of punitive damages was a question of "substantive" law, to which the law applicable according to choice-of-law or conflict-of-laws rules applies, not "procedural" law, which is governed by the law of the forum state. *Id.* at 1405–09. The parties have not disputed either of those conclusions here.

 The first step in determining the actual choice-of-law is to determine the proper characterization of what kind of claim is involved, and the law of the forum controls this question as well. *Id.* at 1404. As this court observed in *Harlan Feeders*,

Iowa applies the "most significant relationship test" to conflict-of-laws or choice-of-law questions involving either contract or tort claims. *See Christie v. Rolscreen Co.*, 448 N.W.2d 447, 450 (Iowa 1989) (recognizing that the "most significant relationship" test applies to tort causes of action, citing *Zeman v. Canton State Bank*, 211 N.W.2d 346, 349 (Iowa 1973)); *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (tort); *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980) (contract); *Zeman*, 211 N.W.2d at 349 (tort issue); *Lindstrom v. Aetna Life Ins. Co.*, 203 N.W.2d 623 (Iowa 1973) (contract issue); *Berghammer v. Smith*, 185 N.W.2d 226 (Iowa 1971) (tort issue); *In re Marriage of Whelchel*, 476 N.W.2d 104, 109 (Iowa Ct.App.1991) (in marital property case, the court noted that "[i]n other areas of the law, Iowa has adopted, as choice-of-law doctrine, the 'most significant relationship' rule espoused by the Restatement (Second) of Conflict of Laws," citing *Lindstrom* and *Berghammer*); *see also Drinkall*, 32 F.3d at 331 (citing *Cameron*, 407 N.W.2d at 597 (tort), and *Cole*, 296 N.W.2d at 781 (contract)); *Gould, Inc.*, 918 F.2d at 1363 n. 3 (citing *Cole* (contract), and *Zeman* (tort)). However, the factors the court is to consider are not identical in the context of torts and contracts. . . .

*Harlan Feeders*, 881 F.Supp. at 1405. At issue in this part of Automatic's first motion are contract or quasi-contract claims—specifically, breach of contract and unjust enrichment claims—and tort claims—misappropriation and conversion claims.

Thus, the court turns to the application of appropriate factors for contract and tort claims under Iowa's "most significant relationship" test.

#### c. Application of the rules

 **i. Contract and quasi-contract claims.** Under the Iowa choice-of-law or conflict-of-laws test for contract actions, the parties may, with certain restrictions, select for themselves the law that will apply to their contract. *Harlan Feeders*, 881 F.Supp. at 1411 (citing *Cole*, 296 N.W.2d at 781, in turn citing Restatement (Second) of Conflict of Laws § 187). Where the parties do not make that choice, the "most significant relationship" test of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 applies, and the court applies the law of the jurisdiction with the "most significant relationship" to the

transaction or dispute. *Id.* (also citing *Cole,* 296 N.W.2d at 781, which adds that "[w]e think it clear that choice-of-law questions are now to be determined under the Restatement (Second) test.").

The "most significant relationship" test of § 188 of the RESTATEMENT was explained in *Wilmotte,* 258 N.W.2d at 326, as follows:

Section 188 of the Restatement has reference to the "most significant relationship" rule to determine the law to be applied with respect to the rights and duties of the parties under a contract where the contract did not make an effective choice as to which state law should be applied in construing or enforcing the contract. In determining which state has the most significant relationship to the issue in question various contacts with the different states are determined. These contacts include the place of contracting, the place of negotiation of the contract, the place of performance, the locale of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business. Also, in determining any conflicts of law questions with respect to the interpretation or enforcement of contracts, the following factors must be taken into account:

"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

"(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

"(d) the protection of justified expectations,

"(e) the basic policies underlying the particular field of law,

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to be applied."

*See* Restatement, Second, Conflict of Laws, Choice of Law Principles, § 6, p. 10.

*Wilmotte,* 258 N.W.2d at 326.

 As to the place of contracting, *see id.* (identifying this as one of the principal factors under RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188), Dethmers asserts that there is at least a genuine issue of material fact that the place was California, where Parent first showed his sketches to Bachman and Bachman and Parent purportedly reached an agreement that Automatic would keep Parent's invention and related information confidential. Dethmers also points out that the place at which negotiations between Parent and Automatic ultimately failed was Nevada. However, even if there was no genuine issue of material fact that the relationship began in California and ended in Nevada, the court observes that application of the choice-of-law or conflict-of-laws test is a process of balancing the various factors to determine the place with the most significant relationship, not just a place with some significant contact. For example, Automatic counters that Nebraska was the place of almost all other significant contacts. The record reveals, for example, that the place of performance and the locale of the subject matter of the contract is Nebraska, *see id.* (also considering these factors pursuant to § 188), because Nebraska is where further discussions took place and where Automatic attempted to develop a prototype incorporating Parent's ideas. Furthermore, while Parent, a Canadian, was not domiciled or resident in any United States jurisdiction, Automatic's domicile, residence, nationality, place of incorporation, and place of business are all Nebraska. *Id.* Although Dethmers is an Iowa corporation, Dethmers is only a subsequent assignee of any contract between Automatic and Parent, and therefore Dethmers's domicile would not have figured in the original parties' contemplation of the law applicable to any bargain between them. Considering these primary factors, therefore, the court concludes that there is no genuine issue of material fact that they weigh in favor of Nebraska as opposed to any other nominee forum.

Turning to additional factors drawn from the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6, *see Wilmotte*, 258 N.W.2d at 326, the court also concludes that California's interest in determination of the particular issues involved is only incidental, as it was mere happenstance that California was the forum in which the parties to the alleged contract first met. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(c). Furthermore, the needs of the interstate and international systems do not require imposition of the law of California, Iowa, or Nevada, *id.* at § 6(a), because Nebraska law is more appropriate to a cause of action by a foreigner, or that foreigner's assignee in Iowa, against a Nebraska defendant for injuries suffered as the result of contractual relations negotiated in part and performed (or breached) almost entirely in Nebraska. The court also concludes that the relevant policies of the possible states weigh in favor of selection of Nebraska law, because California's or Nevada's interest is only incidental, and Iowa's limited, while Nebraska's interest in prohibiting punitive damages against a resident corporation for alleged breach of a contract to be performed in Nebraska is direct and significant. *Cf. Harlan Feeders*, 881 F.Supp. at 1410 (weighing the policy interests of Nebraska in its prohibition on punitive damages against the interests of other states); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(b) & (c). The basic policies underlying the particular field of law have been considered, and the court concludes that Nebraska's rejection of the necessity of deterrence by imposition of punitive damages should be respected. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(e). Considering the "justified expectation" factor, *id.* at § 6(d), certainly neither Parent nor Automatic could reasonably have expected Iowa, California, or Nevada law to apply over Nebraska law to any agreement between them, when Parent was a foreigner, neither Iowa nor Nevada had any interest at all at the time of formation of the alleged agreement, and the presence of the parties in California at the time the alleged agreement was negotiated, and in Nevada at the time negotiations for joint activity failed, was merely happenstance; in contrast, Automatic was doing business in Nebraska and would perform the alleged agreement there. Further-

more, there is greater certainty and predictability to be derived from applying the law of Nebraska to an agreement entered into with a Nebraska company by a foreigner concerning joint development of an invention where such development would necessarily occur in Nebraska and any resulting product would necessarily be manufactured in and marketed from Nebraska. *Id.* at 6(f). Finally, the court has had no difficulty in determining what law would apply to the question of punitive damages in any of the nominee states. *Id.* at 6(g).

Thus, the court concludes that there is no genuine issue of material fact that Nebraska law, which bars punitive damages, is applicable to Dethmers's contract and quasi-contract claims. Therefore, Automatic is entitled to partial summary judgment on Dethmers's prayer for punitive damages on such claims.

*ii. Tort claims.* For tort claims, the Iowa Supreme Court has stated that [c]onsiderations [in the most significant relationship test] include: place of injury, place of conduct leading to the injury, domicile of the parties, and the place where any relationship between the parties is centered.

*Harlan Feeders*, 881 F.Supp. at 1409 (quoting *Zeman*, 211 N.W.2d at 349; *see also Christie*, 448 N.W.2d at 450 (quoting *Zeman*)). These are also the factors listed in RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2), which the Iowa Supreme Court has adopted. *Cameron*, 407 N.W.2d at 597; *accord Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897–98 (Iowa 1996). However, this court has noted that the first factor, place of injury, now receives only "limited weight." *Harlan Feeders*, 881 F.Supp. at 1409.

The "place of injury," *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2); *Harlan Feeders*, 881 F.Supp. at 1409, is not necessarily Iowa, although that is where Dethmers, the assignee of the alleged contract may at first glance be supposed to be injured, because Dethmers's principal place of business is in Iowa. Rather, Nebraska is where the allegedly injurious development, production, and sales of products and other alleged misappropriations and conversions

took place. However, even genuine factual dispute as to the place of injury would not be dispositive, because of the limited weight this factor receives. *See Harlan Feeders*, 881 F.Supp. at 1409. Perhaps weighing in favor of Nebraska law is the domicile of the parties, where Automatic, an original party to the relationship between Automatic and Parent is domiciled in Nebraska, and Dethmers, only a subsequent assignee of Parent, is domiciled in Iowa. The decisive factors in the circumstances of this case, however, are undoubtedly the place of conduct leading to the alleged injuries and the place where the relationship between the parties is centered. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2); *Harlan Feeders*, 881 F.Supp. at 1409. That place is Nebraska as to both factors.

Consequently, there is no genuine issue of material fact that Nebraska law also applies to Dethmers's tort claims in division III of its complaint. Therefore, Automatic is entitled to partial summary judgment on Dethmers's prayer for punitive damages on such claims.

### 2. Conversion of intangible ideas

Automatic next seeks dismissal of Count VI, Dethmers's conversion claim, pursuant to FED.R.CIV.P. 12(b)(6), on the ground that there can be no claim for conversion of intangible "ideas." Dethmers contends that all jurisdictions having a material interest in the claims presented recognize common-law claims for conversion and that claims for conversion of intangible property will lie in a wide variety of circumstances.

### a. Applicable standards

The standards applicable to this portion of Automatic's first motion, brought only pursuant to Rule 12(b)(6), differ from those applicable to a motion for summary judgment. Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6). The issue is not whether a plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to offer evidence in support of its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir.1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303–04 (8th Cir.1997) ("In considering a motion to dismiss, we assume all facts in the complaint are true, construe the complaint in the light most favorable to the plaintiff, and affirm the dismissal only if 'it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,'" quoting *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994)); *WMX Technologies, Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir.1997) ("In considering a motion to dismiss, the court must construe the complaint liberally and assume all factual allegations to be true."); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir.1996) (same).

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir.1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *accord Conley*, 355 U.S. at 45–46, 78 S.Ct. 99 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997) ("'A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir.1982)); *Doe*, 107 F.3d at 1304 (dismissal is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief,'" quoting *Coleman*, 40 F.3d at 258); *WMX Technologies, Inc.*, 105 F.3d at 1198 ("Dismissal should not be granted unless it appears be-

yond a reasonable doubt that the plaintiff can prove no set of facts that would entitle relief," citing *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99). The Rule does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995) (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). Automatic asserts there is such an "insuperable bar to relief" on this claim, because, like most jurisdictions, Nebraska has not recognized a claim for conversion of an intangible idea.

#### b. Conversion of "intangible ideas"

■ Automatic contends that a conversion claim will not lie for "conversion" of intangible ideas. Dethmers concedes that only "tangible" interests were originally subject to the tort of conversion, but Dethmers contends that modern formulations of the tort of conversion apply to "intangible" property interests, as well as tangible ones. This court has previously observed that "recent decisions demonstrate the narrowness of the 'intangibles' included within the scope of a conversion claim." *Hanson v. Hancock County Mem. Hosp.*, 938 F.Supp. 1419, 1439 (N.D.Iowa 1996) (citing *Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 235–36 (8th Cir.1996), which held that under New York law of conversion, based on Restatement (Second) of Torts § 222A, "[e]ven under an expanded definition of the tort, conversion is limited to those intangible property rights customarily merged in, or identified with, some document," in turn citing *Ippolito v. Lennon*, 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1989), and RESTATEMENT (SECOND) OF TORTS § 242; *H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531, 1547 (1989), which held that under Minnesota law, conversion generally applies only to tangible property, "or intangible property customarily merged in, or identified with, some document," in turn citing

PROSSER & KEETON ON TORTS, 91–92 (1984), and RESTATEMENT (SECOND) OF TORTS §§ 222A, 242 (1965)). The Parent Invention does not appear to fall within this narrow range of intangible property interests.

Nonetheless, the court finds that there are various and conflicting answers to the question of whether a conversion claim will lie for alleged conversion of an unpatented idea or invention, the particular kind of claim at issue here. Georgia, for example, recognizes a claim for conversion of an unpatented or unpatentable idea or product with the following elements: (1) the idea must be novel; (2) the disclosure of the idea must be made in confidence; (3) the idea must be adopted and made use of by the defendant; and (4) the idea must be sufficiently concrete in its development to be usable. *See Jones v. Turner Broadcasting Sys., Inc.*, 193 Ga.App. 768, 770, 389 S.E.2d 9, 11 (1989), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *Morton B. Katz & Assocs., Ltd. v. Arnold*, 175 Ga.App. 278, 280, 333 S.E.2d 115 (1985); *see also Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 710 (11th Cir.1990) (citing *Jones* and *Morton B. Katz*). The Minnesota Court of Appeals, relying in part on Georgia decisions, has also held that, although abstract ideas are not generally protectable property interests, claims for conversion of an unpatented idea would lie if the abstract idea was sufficiently novel and concrete. *See Tate v. Scanlan Int'l, Inc.*, 403 N.W.2d 666, 671–72 (Minn.Ct.App.1987) (upholding a jury's verdict that an unpatented idea for a surgical supply product was sufficiently novel and concrete for an award of damages for its conversion). Dethmers has pleaded a common-law conversion claim that would fit within the elements of a claim for conversion of an unpatented idea as formulated by the Georgia and Minnesota courts: Dethmers alleges the novelty of Parent's invention; that his invention was disclosed to Automatic only under conditions of confidentiality; that Automatic adopted Parent's idea and made use of it; and that Parent's idea was already sufficiently concrete in its development to be reduced to sketches.

Other courts recognize a related claim for "appropriation" of an unpatented idea, also

finding that the claim will lie where the unpatented idea reflects "genuine novelty and invention." *See Oasis Music, Inc. v. 900 U.S.A., Inc.*, 161 Misc.2d 627, 631, 614 N.Y.S.2d 878, 882 (1994) (citing *Murray v. National Broad. Co., Inc.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). However, other courts hold that an idea is not the property of anyone, and thus cannot obtain any legal protection, unless it is expressed in a legally protected manner, such as by being patented, copyrighted, trademarked, or imparted pursuant to a fiduciary or contractual relationship. *See Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 551 N.E.2d 172, 175 (1990).

 Nebraska law, however, is the law this court has concluded is applicable to the conversion claim here. The Nebraska Supreme Court defines a tortious conversion as any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights. *Barelmann v. Fox*, 239 Neb. 771, 478 N.W.2d 548 (1992); *Hecker v. Ravenna Bank*, 237 Neb. 810, 468 N.W.2d 88 (1991); *Mason v. Schumacher*, 231 Neb. 929, 439 N.W.2d 61 (1989). Thus, under Nebraska law, conversion is " 'any unauthorized act which deprives the owner of his property permanently or for an indefinite period of time,' " *B.E. Implement Co. v. Valley Farm*, 216 Neb. 269, 273, 343 N.W.2d 892, 894 (1984), and " 'any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.' " *Id.* at 273, 343 N.W.2d at 894–95. Whether the definition of "property" under this formulation is broad enough to include an intangible, unpatented idea, is a question no Nebraska court appears to have answered.

The court raised with the parties the possibility of certifying the question of the viability of this claim under Nebraska law to the Nebraska Supreme Court pursuant to NEB. REV. STAT. § 24–219. However, the parties indicated that they were content to have this court decide that question. The court concludes that, because Nebraska has not specifically foreclosed the possibility of a claim for conversion of an intangible, unpatented idea, this court cannot conclude that there is an "insuperable bar to relief" on Dethmers's

conversion claim. *Parnes*, 122 F.3d at 546; *Frey*, 44 F.3d at 671. Automatic's motion to dismiss this claim will therefore be denied. However, the court is not foreclosing the possibility that, upon a proper motion, with a more fully developed record and briefing directed specifically to the question, the court will reexamine the viability of such a claim under both Nebraska law and the facts that can be proved in this case.

### 3. The "statutory" misappropriation claim

 Count IV seeks compensatory and punitive damages and injunctive relief for "statutory" misappropriation by Automatic of a trade secret, the "Parent Invention." Automatic prays for a more definite statement of this claim, because Dethmers has failed to identify or specify any statute upon which the claim is based, or even the jurisdiction whose statutes might form the basis for such a claim. Dethmers responds that it has complied with the requirements of notice pleading, which do not require it to do more than inform Automatic that Dethmers asserts a statutory misappropriation claim. Dethmers also contends that the motion is premature, because the court must first resolve the threshold question of what state's law is applicable to the claim.

Rule 12(e) of the Federal Rules of Civil Procedure provides as follows:

If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

FED.R.CIV.P. 12(e). Commentators state that "[t]he situations in which a Rule 12(e) motion is appropriate are very limited." 5A CHARLES A. WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 1377 (1990). Furthermore, "[a]bsent special circumstances, a Rule 12(e) motion cannot be used to require the pleader to set forth the statutes or judicial decisions upon which he intends to rely." *Id.* However, "even though a complaint is not defective for failure to designate the statute or other provision of law violated, the judge may in his discretion, in response to a motion for more definite statement under Federal Rule of Civil Procedure 12(e), require such detail as may be appropriate in the particular case, and may dismiss the complaint if his order is violated." *McHenry v. Renne,* 84 F.3d 1172, 1179 (9th Cir.1996). Repleading may be appropriate, this court concludes, where, as Automatic argued, there may be statutory defenses that must be pleaded in an answer to a statutory misappropriation claim under the law of the appropriate state.

The court has now resolved what Dethmers described as the "threshold question": The law that is applicable to Dethmers's "statutory" misappropriation claim is Nebraska's. Thus, the universe of potentially applicable statutes upon which Count IV of Dethmers's complaint could be based has considerably contracted. The court notes that Nebraska has in place a Trade Secrets Act, codified at NEB. REV. STAT. § 87–500 *et seq.,* which in part provides for injunctive relief from and damages for misappropriation of trade secrets. *See* NEB. REV. STAT. §§ 87–503 & 87–504. Furthermore, at oral arguments, Dethmers professed itself ready to replead this claim specifically identifying what statutes are involved once the court has identified the state whose law is applicable to the claim. Consequently, the court concludes that, as construed by the court, no more definite statement of Count IV is required and this portion of Automatic's motion will be denied. However, the court anticipates that Dethmers will now make good on its promise to replead the claim in light of the applicable law.

#### 4. The "misappropriation of intellectual property" claim

In the last part of its motion to dismiss, Automatic has moved, pursuant to FED. R.CIV.P. 12(f), to strike Count VII of Dethmers's complaint, which is the claim for "misappropriation" of "intellectual property."

Automatic contends that this count is redundant of the "statutory" and "common-law" misappropriation claims in Counts IV and V, which allege misappropriation of "trade secrets," as well as the conversion claim in Count VI. Dethmers contends that motions to strike are disfavored; Automatic can show no prejudice if its motion to strike is not granted; and Automatic has made only general assertions of redundancy without demonstrating the nature of such redundancy.

#### a. Standards for a motion to strike

 Rule 12(f) of the Federal Rules of Civil Procedure provides for a motion to strike as follows:

> **(f) Motion to Strike.** *Upon motion* made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, *the court may order stricken from any pleading* any insufficient defense or *any redundant,* immaterial, impertinent, or scandalous *matter.*

FED.R.CIV.P. 12(f) (emphasis added). Courts have considered various factors to determine whether claims are redundant. *See Velez v. City of New London,* 903 F.Supp. 286, 291 (D.Conn.1995) (a respondeat superior claim was redundant where the plaintiff had recourse against the defendant for his tort claims via state indemnification statutes); *Kusek v. Family Circle, Inc.,* 894 F.Supp. 522, 528 (D.Mass.1995) (a claim for unjust enrichment was redundant where it repleaded a trademark infringement claim as a claim for equitable relief and another claim of "co-opt" was redundant as merely a recasting of claims for trademark infringement and/or for consumer fraud); *Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 61 (S.D.N.Y. 1994) (a claim was redundant of another claim within the meaning of Rule 12(f) where it essentially duplicated another claim involving the same promisor, the same acts of breach, and the same measure of damages); *and compare Fink v. DeClassis,* 745 F.Supp. 509, 515 (N.D.Ill.1990) (a claim of breach of warranty was not redundant of a claim of

breach of contract, even though the claims sought essentially the same relief and plaintiff could not obtain duplicative recovery, because the plaintiff was entitled to assert alternative theories and could not be compelled to elect one remedy over another in the absence of prejudice to the defendant). From these precedents, the court concludes that mere duplicative remedies do not necessarily make claims "redundant" within the meaning of Rule 12(f), if the claims otherwise require proof of different elements; however, a claim that merely recasts the same elements under the guise of a different theory may be stricken as redundant pursuant to Rule 12(f).

### b. Redundancy

Thus, the question of whether Count VII is redundant of other claims turns upon the law applicable to each claim. In this case, as the court determined above, the applicable law is the Nebraska law of trade secrets and intellectual property. Automatic asserts that while Nebraska law recognizes a claim for misappropriation of trade secrets, citing *Richdale Dev. Co. v. McNeil Co., Inc.*, 244 Neb. 694, 508 N.W.2d 853, 859 (1993), its counsel has found no Nebraska cases recognizing a separate cause of action for misappropriation of "intellectual property."

As noted above, Nebraska has a Trade Secrets Act (TSA) codified at NEB. REV. STAT. § 87–501 *et seq.* Section 87–502(4) defines a "trade secret" under the Nebraska TSA as

information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NEB. REV. STAT. § 87–502(4); *see also Richdale Dev. Co.*, 508 N.W.2d at 859–60. The statute defines "misappropriation" as

(a) Acquisition of a trade secret of another by a person who knows or has rea-

son to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret;

(ii) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(A) Derived from or through a person who had utilized improper means to acquire it;

(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that the information was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

NEB. REV. STAT. § 87–502(2). Thus, to establish a claim for misappropriation of a trade secret under the Nebraska TSA, the Nebraska Supreme Court noted that its prior precedent required proof of the following:

(1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.

*Richdale Dev. Co.*, 508 N.W.2d at 859 (quoting *Selection Research, Inc. v. Murman*, 230 Neb. 786, 433 N.W.2d 526, 532 (1989)).

The court in *Richdale*, however, held that "the existence of an employer-employee relationship is not a required element for misappropriation of a trade secret under the

Trade Secrets Act." *Id.* The court reiterated that "the subject matter of a trade secret must be *secret,*" and "the claimant must allege elements outside the scope of copyright protection: a relationship of secrecy and an actual *trade secret.*" *Id.* (emphasis in the original). Therefore, redacting the elements stated above for a situation in which there is no employment relationship between the party asserting the trade secret and the party who allegedly misappropriated it, the court holds that the elements of such a claim are the following: (1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the inventor in the conduct of his business; (3) the inventor's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the defendant during a relationship of trust and confidence and under circumstances making it inequitable and unjust for the defendant to disclose it to others or to use it himself to the inventor's prejudice. *Cf. id.* This court adds that there must, of necessity, be a fifth element, the defendant's "misappropriation" of the trade secret within the meaning of NEB. REV. STAT. § 87–502(2), which requires either "acquisition" or "disclosure" by "improper means."

The court notes that there is at least a semantic difference in the way Dethmers's "intellectual property" and "trade secrets" misappropriation claims are stated. Count IV alleges that Automatic has "misappropriated the protected trade secrets of *Parent,*" Second Supplemental Amended Complaint, Count IV, ¶ 41 (emphasis added); *see also id.,* Count V, ¶ 45 (identical allegation in "common-law" misappropriation claim), while Count VII alleges that Automatic has "misappropriated the intellectual property of *Dethmers.*" *Id.,* Count VII, ¶ 51 (emphasis added). It is not immediately apparent that the "intellectual property of Dethmers" is necessarily and only the "trade secrets of Parent," although that might be a reasonable assumption.

There is the additional difference between the "trade secrets" and "intellectual property" claims in that Dethmers has specifically

alleged in the former that the "trade secrets" at issue "had value in not being generally known and was treated as confidential trade secret information through the taking of reasonable precautions to preserve its secrecy, qualifying it for trade secret protection." Second Supplemental Amended Complaint, Count IV, ¶ 40 (emphasis added); *see also id.,* Count V, ¶ 44 (identical allegation in "common-law" misappropriation claim, but adding that the protection is from the "common law"). Such an allegation is absent from the "intellectual property" claim. Thus, it appears that Dethmers distinguished between the two kinds of claims at least in part on the basis of the "secrecy" of the matter misappropriated, *see Richdale Dev. Co.,* 508 N.W.2d at 859 ("the subject matter of a trade secret must be *secret,*" and "the claimant must allege elements outside the scope of copyright protection: a relationship of secrecy and an actual *trade secret*"), and possibly in the identity of the matter actually at issue. Thus, the elements of the claims alleged are not identical, so that the "intellectual property" claim does not merely recast the same elements under the guise of a different theory, which would be a ground for striking the "intellectual property" claim as redundant pursuant to Rule 12(f). FED.R.CIV.P. 12(f) (allowing "redundant" claims to be stricken). However, the court must consider a further issue before ruling on Automatic's Rule 12(f) motion.

### c. Recognition of the cause of action

Like Automatic, this court has found no Nebraska authority recognizing a separate claim for misappropriation of "intellectual property." Dethmers has cited no authority from any jurisdiction recognizing such a claim, and this court has found but scant authority considering such a claim. *See, e.g., International News Serv. v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (implicitly recognizing such a common-law claim of misappropriation of intellectual property, but limiting it to cases where intellectual property, lawfully obtained, is used in direct competition with the person who created it);[6] *Wright v. Tidmore,* 208 Ga.App. 150,

---

**6.** Thus, another distinction between the elements of a claim of misappropriation of "trade secrets," under the Nebraska statute, and misappropria-

tion of "intellectual property," under the common law, might be that "improper means" of acquisition are not required.

430 S.E.2d 72, 73 (1993) (finding no authority in that jurisdiction for a common-law claim of misappropriation of intellectual property or common-law copyright, although there was authority "recogniz[ing] that an author or inventor has a property right in the product of his mental labors ...," but finding summary judgment on the claim property granted whether the claim was recognized or not, because the plaintiff had not shown a "misappropriation"); *Fenton McHugh Prods., Inc. v. WGN Continental Prods. Co.*, 105 Ill. App.3d 481, 61 Ill.Dec. 384, 434 N.E.2d 537 (1982) (considering a claim of misappropriation of a common-law copyright); *Gilroy v. American Broad. Co., Inc.*, 47 A.D.2d 728, 365 N.Y.S.2d 193 (1975) (considering a common-law claim for misappropriation of a literary character). On the other hand, the court has found no Nebraska authority specifically foreclosing such a claim. *Compare Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 316 (Iowa 1998) (declining to recognize a common-law claim of misappropriation of intellectual property in addition to Iowa's statutory claim for misappropriation of a trade secret, because the jury did not apportion any of the damages in the case to that theory). Because Nebraska has not specifically foreclosed the possibility of a claim for misappropriation of intellectual property, and the claim is not necessarily redundant of other theories of recovery, Automatic's motion to strike this claim will be denied.

The court also proposed to the parties the possibility of certifying the question of the viability of this claim under Nebraska law to the Nebraska Supreme Court pursuant to NEB. REV. STAT. § 24–219. As with the claim of conversion of an unpatented idea, the parties declined the proposal. Therefore, while the court has concluded that there is no "insuperable bar" nor any "redundancy" to the claim at the pleading stage of the proceedings, the court is not foreclosing the possibility that, upon a proper motion, with a more fully developed record and briefing directed specifically to the question, the court will reexamine the viability of such a claim under both Nebraska law and the facts that can be proved in this case.

Another pertinent question might be whether Dethmers can maintain both a "statutory" and a "common-law" claim for misappropriation of trade secrets under Nebraska law, but Automatic has not raised that question. The court assumes that both a "statutory" and a "common-law" claim were filed, because it was unclear even to the plaintiff which state's law would be applicable, and hence it was unclear whether that state provided a statutory or only a common-law claim for misappropriation of trade secrets. Although the court has now determined that the applicable law is Nebraska's, and that Nebraska has a statutory cause of action for misappropriation, the court nonetheless will not *sua sponte* dismiss the common-law claim for misappropriation of a trade secret as redundant of and/or preempted by the statutory claim, because the parties have not briefed that question.

### 5. Summary

In short, Automatic is entitled to partial summary judgment on Dethmers's prayer for punitive damages on its tort and contract claims, because Nebraska law prohibits punitive damages. Automatic's motion to dismiss the claim for conversion of "ideas" will be denied, because Nebraska has not specifically foreclosed the possibility of a claim for conversion of an intangible, unpatented idea. The court also concludes that Automatic's motion for a more definite statement of Count IV will be denied, in light of the court's conclusion that Nebraska law is applicable to the claim, and hence it is made pursuant to the Nebraska Trade Secrets Act, codified at NEB. REV. STAT. § 87–500 *et seq.* Finally, because Nebraska has not specifically foreclosed the possibility of a claim for misappropriation of intellectual property, and the claim is not necessarily redundant of other theories of recovery, Automatic's motion to strike this claim will be denied.

### C. Standards For Summary Judgment In Patent Cases

The remaining motions before the court are for summary judgment or partial summary judgment on patent issues. Therefore, the law of the Federal Circuit applies. *See, e.g., Pro–Mold & Tool Co., Inc.*, 75 F.3d at 1574 ("When considering issues which are not unique to our jurisdiction we defer to the law of the regional circuit. When the issues

involve substantive questions within our exclusive jurisdiction, however, we do not defer to the regional circuit"; citations omitted).

"Summary judgment is appropriate in a patent case, as in other cases...." *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994) ("The grant of summary judgment [in a patent case] is appropriate where the standards set forth in Rule 56(c) are satisfied."); *Paragon Podiatry Laboratory, Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir. 1993); *Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir. 1991) ("Summary judgment is as available in patent cases as in other areas of litigation."); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed.Cir.1990) ("As in other cases, the grant of summary judgment under *Fed.R.Civ.P.* 56, is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.") (footnote omitted); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed.Cir.1990); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576 (Fed.Cir.1989); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984); *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983).

The Supreme Court has established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1560 (Fed.Cir.1995) ("The purpose of summary judgment is to avoid an unnecessary trial, by enabling an expeditious procedure whereby, for issues on which there is no

material factual dispute, the court can decide the controversy by applying the law to the undisputed facts," citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505); *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir.1991). Rule 56 "is a vehicle for the convenience of the parties and courts, for use when the circumstances warrant; but is not a substitute for trial when decision of the controversy requires resolution of disputed factual issues." *Glaverbel*, 45 F.3d at 1560 (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548).

■■■ As noted above, Rule 56 provides for summary judgment in favor of either a claimant or a defendant on a claim if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a)–(c); *Glaxo Group, Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1370–71 (Fed.Cir.1998); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274 (Fed.Cir. 1995); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1536 (Fed.Cir.1995). Thus, in a patent case, in order for the court to grant summary judgment, "there must ... be no genuine issue of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 772 (Fed.Cir.1995) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed.Cir.1992)); *Nike, Inc.*, 43 F.3d at 646 ("Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.").

A court considering a motion for summary judgment must view all of the facts in the light most favorable to the nonmoving party, and give the non-movant the benefit of all reasonable inferences that can be drawn from the facts. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Glaxo Group, Ltd.*, 153 F.3d at 1370–71 ("Under this standard, all reasonable infer-

ences must be drawn and all factual disputes resolved in favor of the non-movant."); *Gasser Chair,* 60 F.3d at 772 (the district court must "view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, ... and ... resolve all doubt over factual issues in favor of the party opposing summary judgment," quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir. 1985) (in banc)); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d at 1274; *Comair Rotron, Inc.,* 49 F.3d at 1536 ("The evidence provided by the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor."); *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1450 (Fed.Cir.1993).

The party seeking summary judgment " 'always bears the initial responsibility of informing the district court of the basis for its motion.' " *Glaverbel,* 45 F.3d at 1560 (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *Conroy,* 14 F.3d at 1575; *Copelands' Enters., Inc. v. CNV, Inc.,* 945 F.2d 1563, 1565 (Fed.Cir.1991). The moving party must " 'identify[ ] those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.' " *Glaverbel,* 45 F.3d at 1560 (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, which in turn cites *Fed.R.Civ.P.* 56(c)); *Conroy,* 14 F.3d at 1575 ("The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather discharge[s] its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.").

In response, " 'the nonmoving party [must] go beyond the pleadings and by [its] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." ' " *Glaverbel,* 45

F.3d at 1560 (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). A material fact is one that may affect the decision, so that the finding of fact is relevant to the proceedings. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1196 (Fed.Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *KeyStone Retaining Wall,* 997 F.2d at 1449 ("A material fact is one that may affect the decision, whereby the finding of that fact is relevant and necessary to the proceedings," citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). An issue of material fact is genuine if it has a real basis in the record. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348; *and compare Glaxo Group, Ltd.,* 153 F.3d at 1370–71 ("A dispute is genuine if a reasonable jury could return a verdict in favor of the non-movant."). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1572 (Fed.Cir.1994) ("When material facts are in dispute summary adjudication may nonetheless be appropriate if, with all factual inferences drawn in favor of the non-movant, the movant would nonetheless be entitled to judgment as a matter of law."); *Tone Bros.,* 28 F.3d at 1196 ("The court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law."); *Continental Can,* 948 F.2d at 1265. The correct law must, of course, be applied, whether to undisputed facts or to disputed facts viewed favorably to the nonmovant. *Stark,* 29 F.3d at 1573.

When the movant's burden of establishing the lack of a genuine issue of material fact has been met "in facial terms," the nonmovant must point to "some evidence in the record sufficient to suggest that [the nonmovant's] view of the issue might be adopted by a reasonable factfinder." *Id.* at 1560–61.[7]

7. On this point, the Eighth Circuit Court of Appeals has observed that, although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " *Metge v. Baehler,*

762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

"[S]ummary judgment may be granted when no 'reasonable jury could return a verdict for the nonmoving party.'" *Nike, Inc.,* 43 F.3d at 646 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505); *see also Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party"); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d at 1274 (also citing *Anderson*); *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1196 (Fed.Cir.1994); *Tone Bros.,* 28 F.3d at 1196 ("The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof."); *KeyStone Retaining Wall,* 997 F.2d at 1449 (sufficient evidence must be presented that a reasonable fact finder could decide the question in the non-movant's favor).

 Finally, the court must consider the appropriateness of summary judgment on questions of patent infringement and invalidity. The Federal Circuit Court of Appeals has cautioned that "[a] district court should approach a motion for summary judgment on the fact issue of infringement with great care." *Cole v. Kimberly-Clark Corp.,* 102 F.3d 524, 528 (Fed.Cir.1996), *cert. denied,* ── U.S. ──, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); *see also Glaxo Group, Ltd.,* 153 F.3d at 1370 ("We review the grant of summary judgment of non-infringement without deference to the district court."). However, "[w]here the determination of infringement turns solely on the legal question of the proper construction of the claims, summary judgment is appropriate." *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1371 (Fed.Cir.1998); *Laitram Corp. v. Morehouse Indus., Inc.,* 143 F.3d 1456, 1462 (Fed.Cir.1998); *Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 530 (Fed.Cir. 1995). Also, "'in rendering a decision on a motion for summary judgment, a court must "view the evidence presented through the prism of the substantive evidentiary burden" that would inhere at trial.'" *Rockwell Int'l Corp. v. United States,* 147 F.3d 1358, 1362 (Fed.Cir.1998) (quoting *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh,* 139 F.3d

877, 880 (Fed.Cir.1998), in turn quoting *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505). Thus, "the ... determination of invalidity [on summary judgment]... must be predicated on facts established by clear and convincing evidence." *Id.; Laitram Corp.,* 143 F.3d at 1464–65 (where "the district court did not err in holding that [party challenging validity] could not prove invalidity by clear and convincing evidence, [the patentee] was entitled to summary judgment on this issue"); *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir.1996) ("[I]n deciding a motion for summary judgment of invalidity the [heightened] burden of proof [of clear and convincing evidence] must be considered.").

With these standards in mind, the court will consider Automatic's motion for summary judgment on the invalidity of the Dethmers reissue patent and Dethmers's motion for summary judgment on the invalidity and unenforceability of Automatic's patent and Dethmers's non-infringement of that patent.

### D. *Automatic's Motion For Summary Judgment Of Patent Invalidity*

On March 11, 1998, Automatic moved for summary judgment on the invalidity of the Dethmers reissue patent, the Re482 patent. Automatic asserts that the alleged "error" in the original patent asserted by Dethmers in seeking the reissuance is not of the kind that justifies the granting of a reissue patent. Automatic also asserts that the Re482 patent is not for the same general invention as the original '240 patent, the Johnson patent. Finally, Automatic contends that the required declaration of the inventor or his representative in support of the application for a reissue patent is fatally defective. Therefore, Automatic seeks summary judgment on Count II of Dethmers's second supplemental amended complaint, which asserted Automatic was infringing the Re482 patent.

#### 1. *Adequacy of the "error" in the original patent*

Automatic argues as its first ground for summary judgment on the invalidity of the Re482 patent that the alleged "error" in the original patent asserted by Dethmers in seeking the reissuance is not of the kind that

justifies the granting of a reissue patent. More specifically, Automatic argues that Dethmers attempted to reissue the patent to broaden its claims based on an asserted error that the assignee "believed" that, had the original application been drafted differently, the patent would cover more competing devices than the '240 patent covers. Such a "belief," Automatic contends, is a *de novo* reprosecution, based purely on hindsight, in an attempt to make the patent Dethmers purchased encompass as many competing devices as Dethmers had hoped it would. Failure of the inventor to appreciate the limiting effects of claim language is an insufficient error to warrant reissue, Automatic contends, particularly when, as here, the language of the claims and their prosecution history reflect a deliberate choice to limit the claims as stated in the '240 patent. Furthermore, Automatic argues that the claimed error is not about a highly technical or difficult aspect of the invention; there is no supporting statement from the attorney who prosecuted the '240 patent in the reissue prosecution file; and other factors indicate that the "error" alleged in the declaration was not the type of error amenable to correction under 35 U.S.C. § 251.

On this part of the motion, Dethmers counters that there are adequate errors in both the patent and the conduct of the original prosecution to support reissue. The adequate "error in the patent," Dethmers contends, was that Johnson claimed less than he had a right to claim in the original patent. First, the '240 patent potentially limited the patent beyond what was necessary by using the term "pivot block" instead of "pivot member." Second, all of the claims include the limitations of original application claims 2 and 3, which related to pivot arms and locking means, but those limitations were not in fact necessary to patentability. The "error in conduct," Dethmers contends, was Johnson's unintentionally limiting his claims, without any deceptive intent. In reply, Automatic reiterates that these errors are insufficient.

### a. Standards for reissue patents

The patent reissue process, 35 U.S.C. §§ 251–252, is designed to correct mistakes in drafting or the like in a patent already issued. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1047, 137 L.Ed.2d 146 (1997) (holding, *inter alia,* that the availability of the reissue process did not vitiate the viability of the doctrine of equivalents for products that do not literally infringe a patent); *Wahpeton Canvas Co. v. Bremer,* 958 F.Supp. 1347, 1356 (N.D.Iowa 1997) (*Wahpeton II* ); *Wahpeton Canvas Co. v. Bremer,* 893 F.Supp. 863, 872–73 (N.D.Iowa) (*Wahpeton I* ), *appeal denied,* 64 F.3d 671 (Fed.Cir.1995) (Table Opinion). The circumstances under which reissue is permitted are set forth in 35 U.S.C. § 251, which provides in pertinent part:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251. Therefore, in order to obtain a reissue patent, the patentee must file an oath or declaration stating that the original patent is defective because of an "error in the patent," such as claiming more or less than the patentee was entitled to, and an "error in conduct," which is that the error in the patent occurred without deceptive intent. *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 882 F.2d 1556, 1564 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990); *Wahpeton II,* 958 F.Supp. at 1356; *Wahpeton I,* 893 F.Supp. at 872–73. "Whether the statutory requirements of 35 U.S.C. § 251 have been met is a question of law," although "[t]his legal conclusion can involve underlying factual questions." *Hester Indus., Inc. v. Stein, Inc.,* 142 F.3d 1472, 1479 (Fed.Cir.1998) (citing *In re Clement,* 131 F.3d 1464, 1468 (Fed.Cir.1997)),

*cert. denied,* —— U.S. ——, 119 S.Ct. 372, —— L.Ed.2d —— (1998).[8]

■■■ More specifically, "[t]he 'error' requirement limits the availability of a reissue patent to certain correctable errors." *Id.* The Federal Circuit Court of Appeals recently explained as follows:

> In considering the "error" requirement, we keep in mind that the reissue statute is "based on fundamental principles of equity and fairness, and should be construed liberally." *In re Weiler,* 790 F.2d 1576, 1579, 229 USPQ 673, 675 (Fed.Cir.1986). We also keep in mind that "not every event or circumstance that might be labeled 'error' is correctably by reissue." *Id.* Indeed, the reissue procedure does not give the patentee the right "to prosecute *de novo* his original application." *Id.* at 1582, 790 F.2d 1576, 229 USPQ at 677; *see also Mentor Corp. v. Coloplast, Inc.,* 998 F.2d 992, 995, 27 USPQ2d 1521, 1524 (Fed.Cir. 1993).

*Hester Indus., Inc.,* 142 F.3d at 1480. As is the case here, the "error in the patent" asserted in *Hester* was that someone failed to appreciate the scope of the invention:

> One of the most commonly asserted "errors" in support of a broadening reissue is the failure of the patentee's attorney to appreciate the full scope of the invention during the prosecution of the original patent application. *See [In re]*

*Amos,* 953 F.2d [613,] 616, 21 USPQ2d [1271,] 1273 [(Fed.Cir.1991)]; *In re Wilder,* 736 F.2d 1516, 1519, 222 USPQ 369, 371 (Fed.Cir.1984)[, *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985) ]. This form of error has generally been accepted as sufficient to satisfy the "error" requirement of § 251. *See Clement,* 131 F.3d at 1468, 45 USPQ2d at 1163; *Wilder,* 736 F.2d at 1519, 222 USPQ at 371.

*Hester Indus., Inc.,* 142 F.3d at 1480–81.[9] Thus, at least on its face, the purported error in the patent asserted here—that Johnson claimed less than he had a right to claim in the original patent, because he failed to appreciate the full scope of the invention—is sufficient.

■■■ However, where the asserted "error" attempts to remove, through reissue, limitations heavily relied upon to obtain allowance of the original patent claims over the prior art, a special concern is raised. *Id.* at 1480.

> This concern is addressed most squarely by the "recapture rule," recently discussed at length in *Clement,* 131 F.3d 1464, 45 USPQ2d 1161. The recapture rule "prevents a patentee from regaining through reissue ... subject matter that he surrendered in an effort to obtain allowance of the original claims." *Clement,* 131 F.3d at 1468, 45 USPQ2d at 1164. The rule is

---

8. The court notes that the appellate decision in *Hester* was handed down on May 7, 1998, after Automatic filed its opening brief, which relied on the district court's decision in *Hester,* but not before Dethmers filed its resistance brief or Automatic filed its reply brief. Both parties made some reference to the appellate decision. Therefore, the parties should not be surprised by this court's heavy reliance on the appellate decision in *Hester.*

9. Automatic makes much of the fact that it is not the patentee's attorney who purportedly did not appreciate the scope of the patentable invention, but the inventor himself, and that Johnson, the original inventor, had died before the reissuance proceedings were initiated or even contemplated. Automatic relies on *Weiler,* 790 F.2d at 1583 n. 4, for the proposition that the *inventor's* "reliance on allegations of the *inventor's* ignorance of drafting and claiming technique is unavailing," because "[t]hose allegations could be frequently made, and if accepted as establishing error, would require the grant of reissues on anything

and everything mentioned in a disclosure." Automatic also points out that nowhere is there a statement from the attorney who prosecuted the original patent, Mr. Frederickson, asserting that *he* did not appreciate the scope of the patentable claims in Johnson's invention. The court concludes, however, that the important issue is not *who* purportedly made the error, but whether the error itself is sufficient to support reissue of the patent. *See Hester Indus., Inc.,* 142 F.3d at 1480–82 (examining in detail the nature of the asserted "error" in the patent). Automatic's argument about the lack of evidence that either Johnson or the attorney who prosecuted the original '240 patent believed Johnson had claimed less than he had a right to claim, however, is more material to the point recognized in *Weiler* that "[i]nsight resulting from hindsight on the part of new counsel does not, in every case, establish error." *In re Weiler,* 790 F.2d at 1583 n. 4. Whether the purported "error" here is the result of hindsight will also become most apparent from examination of the purported error itself, not who made it.

rooted in the "error" requirement in that such a surrender is not the type of correctable "error" contemplated by the reissue statute. *See Mentor*, 998 F.2d at 995–96, 27 USPQ2d at 1525.

*Hester Indus., Inc.*, 142 F.3d at 1480. In *Hester*, the Federal Circuit Court of Appeals first defined the "recapture rule," then established the various steps in the "recapture" analysis:

> "Under [the recapture] rule, claims that are 'broader than the original patent claims in a manner directly pertinent to the subject matter surrendered during prosecution' are impermissible." *Clement*, 131 F.3d at 1468, 45 USPQ2d at 1164 (quoting *Mentor*, 998 F.2d at 996, 27 USPQ2d at 1525). Application of the recapture rule begins with a determination of whether and in what respect the reissue claims are broader than the original patent claims. *See id.* A reissue claim that does not include a limitation present in the original patent claims is broader in that respect. *See id.* . . .
>
> [If] the reissue claims are broader in [some] respects, under the recapture rule we next examine whether these broader aspects relate to surrendered subject matter. *See id.* at 1468–69, 45 USPQ2d at 1164. "To determine whether an applicant surrendered particular subject matter, we look to the prosecution history for arguments and changes to the claims made in an effort to overcome a prior art rejection." *Id.* at 1469, 45 USPQ2d at 1164 (emphasis added). This statement in *Clement* indicates that a surrender can occur by way of arguments or claim changes made during the prosecution of the original patent application. To date, the cases in which this court has found an impermissible recapture have involved claim amendments or cancellations. *See, e.g., id.* at 1469–70, 45 USPQ2d at 1164–65; *Mentor*, 998 F.2d at 995–96, 27 USPQ2d at 1524–25. However, in addition to the suggestion in *Clement* that argument alone can effect a surrender, this court expressly

left open that possibility in *Ball Corp. v. United States:* "If reissue is sought where claims have not been previously canceled, analysis becomes more difficult. In that case relative claim scope is not available to illuminate the alleged error. We are not faced with that situation in this proceeding." 729 F.2d 1429, 1436 n. 19, 221 USPQ 289, 295 n. 19 (Fed.Cir.1984). Prior to this case, this court has not squarely addressed the question.

*Hester Indus., Inc.*, 142 F.3d at 1480–81. In *Hester*, the court specifically concluded that "[a]rguments made to overcome prior art can equally evidence an admission sufficient to give rise to a finding of surrender.... Amendment of a claim is not the only permissible predicate for establishing a surrender." *Id.* at 1481; *see also id.* at 1482 ("Thus we conclude that, in a proper case, a surrender can occur through arguments alone.").[10] The third step in the "recapture rule" analysis—after determining whether the reissue claims are broader in some respects, and whether these broader aspects relate to surrendered subject matter—is to "determine whether the surrendered subject matter has crept back into the asserted reissue claims." *Id.* at 1482. "Finally, because the recapture rule may be avoided in some circumstances, we consider whether the reissue claims were materially narrowed in other respects." *Id.* This consideration is pertinent, because "[r]eissue claims that are broader in certain respects and narrower in others may avoid the effect of the recapture rule." *Mentor*, 998 F.2d at 996; *see also Hester Indus., Inc.*, 142 F.3d at 1482 (citing *Mentor* and *Clement*, 131 F.3d at 1470, for this proposition).

#### b. Application of the standards

In light of the foregoing discussion, the court's analysis of the error in the patent asserted here will proceed in the following steps identified in *Hester:* (1) determination of whether and in what respect the reissue claims are broader than the original patent claims; (2) if the reissue claims are

---

10. The court also likened the "recapture rule" to prosecution history estoppel, "which prevents the application of the doctrine of equivalents in a manner contrary to the patent's prosecution history," because, "[l]ike the recapture rule, prose-

cution history estoppel prevents a patentee from regaining subject matter surrendered during prosecution in support of patentability." *Id.* (citing *Warner–Jenkinson Co.*, 520 U.S. 17, 117 S.Ct. at 1051.)

broader in some respects, examination of whether these broader aspects relate to surrendered subject matter; (3) determination of whether the surrendered subject matter has crept back into the asserted reissue claims; and (4) consideration of whether the reissue claims were materially narrowed in other respects. *See Hester Indus., Inc.,* 142 F.3d at 1480–82.

As to the first step, it is plain that the reissue claims are broader than the original patent claims, because the reissue claims do not include limitations present in the original patent claims. *Hester Indus., Inc.,* 142 F.3d at 1480. As the court noted above, the alteration of the claims of the Re482 patent consisted of deletions of the fourth through eighth indented paragraphs of claim 1 of the '240 patent. Those paragraphs explained the nature of the "pivot arms" that were part of the claimed invention. *See* pp. 989–90 above. The fact that the limitations of the "pivot arms" are removed from claim 1 of the Re482 patent is further demonstrated by the deletion of "arms and" in the last of the indented paragraphs of claim 1 both times those words appear. Furthermore, while all of the claims in the original '240 patent refer to a "pivot block," some of the new claims, independent claims of the Re482 patent, such as claim 6, refer instead to a "pivot member," while new, independent claim 7 refers to a "pivot means." Thus, these new claims do not include the limitation of a "pivot block" found in the original patent.

Because the reissue claims are broader than those of the original patent, the court turns to the second step of the analysis, examination of whether these broader aspects relate to surrendered subject matter. *Hester Indus., Inc.,* 142 F.3d at 1480. " 'To determine whether an applicant surrendered particular subject matter, we look to the prosecution history for *arguments* and changes to the claims made in an effort to overcome a prior art rejection.' " *Id.* (quoting *Clement,* 131 F.3d at 1469; emphasis in the original). Automatic asserts that Johnson elected to include the "pivot arms" as the *only* means of connection to the towed vehicle when the examiner pointed out that this connection means, stated in dependent claim 2 of the application, contradicted the connection means stated in independent claim 1 of

the application. The election of "pivot arms," however, is nowhere asserted to have been made "in an effort to overcome *a prior art rejection,*" *id.* (emphasis added), but instead to overcome an internal inconsistency of the patent application. Indeed, Dethmers asserts that the pivot arms were not necessary to the patentability of the invention, because Johnson already held patents for pivot arms. Thus, while claims **1, 2,** and **3** of the Re482 patent now state *no* connection means to the towed vehicle, the "pivot arms" connection means stated in claim **1** of the '240 patent was not added to surrender the subject matter of other connection means in an effort to overcome a prior art rejection. *Id.* Nor was the choice of language of a "pivot block" made "in an effort to overcome *a prior art rejection.*" *Id.* (emphasis added). Although Automatic points out that the examiner originally rejected claim 4 of the application, which included the pivot block, because no connection was provided between the pivot block and the rear portion of the apparatus, and in doing so observed that "[t]he prior art fails to teach the use of a pivot bolt mounted through a pivot block which allows pivotal movement of the rear portion of the apparatus upon a transverse horizontal axis," this does not mean that the use of "pivot block" was necessary to overcome prior art. These comments mean only that the claim would be allowable if rewritten to provide the missing connection between the pivot block and the rear portion of the apparatus. Johnson's response indicated that he added a new independent claim, which identified the pivot block as included in the rearward portion of the apparatus, to "overcom[e] the examiner's objection to the language of the original claim 4." The examiner's "objection" was again lack of connection, not anticipation by prior art. Because the broader aspects of the Re482 patent do not relate to surrendered subject matter, the asserted "error in the patent" does not run afoul of the "recapture rule" and the court need proceed no further with its analysis of "error in the patent."

Nor can the court find that Automatic has established an inadequate "error in conduct." Automatic has failed to point to any portion of the record undermining Dethmers's asser-

tion that the error in the patent occurred without deceptive intent. *Hewlett–Packard Co.*, 882 F.2d at 1564; *Wahpeton II*, 958 F.Supp. at 1356; *Wahpeton I*, 893 F.Supp. at 872–73. Therefore, Automatic is not entitled to summary judgment of invalidity on the ground that insufficient "errors" were relied upon in seeking reissuance of the '240 patent as the Re482 patent.

### 2. The same invention

Nonetheless, Automatic also asserts that the Re482 patent is invalid because it is not for the same general invention as the original '240 patent. The "original patent" requirement, also found in 35 U.S.C. § 251, "is a second and independent requirement ..., which restricts a reissue patent to 'the invention disclosed in the original patent.'" *Hester Indus., Inc.*, 142 F.3d at 1479 (finding this requirement in 35 U.S.C. § 251 ¶ 1; internal citation omitted).[11]

### a. The appropriate test

In *Hester*, the court reaffirmed that the "original patent" requirement does not depend upon the inventor's "objective intent to claim" the invention as claimed in the reissue patent, a requirement that had been part of the predecessor reissue statute, 35 U.S.C. § 64 (1964). *Id.* at 1484. Thus, Automatic's assertion that the "original intent to claim" analysis "is fatal to the newly added claims of Re. '482" carries far less weight than Automatic might have supposed before the appellate decision in *Hester.*

Rather, [in *In re Amos*, 953 F.2d 613 (Fed.Cir.1991),] the court concluded: "the essential inquiry under the 'original patent' clause of § 251 ... is whether one skilled in the art, reading the specification, would identify the subject matter of the new claims as invented and disclosed by the patentees." *Id.* at 618, 21 USPQ2d at 1275. The court noted that this inquiry is analogous to the "written description" requirement of 35 U.S.C. § 112 ¶ 1 (1994). *Id.* The court further stated that, to the extent the construct of an objective intent

to claim is useful, it is "only one factor that sheds light" on whether the "original patent" clause of § 251 is satisfied. *Id.* at 619 & n. 2, 21 USPQ2d at 1275–76 & n. 2 (quoting *In re Hounsfield*, 699 F.2d 1320, 1323, 216 USPQ 1045, 1047–48 (Fed.Cir. 1983)).

*Hester*, 142 F.3d at 1484–85. In its reply brief, recognizing the import of the appellate decision in *Hester*, Automatic asserts that "intent to claim" remains a factor in the "original patent" analysis and that here it weighs in favor of granting Automatic's motion for summary judgment, because there is no hint that Johnson intended to claim an invention without pivot arms or an invention involving anything other than a "pivot block."

The *Amos* decision, upon which the Federal Circuit Court of Appeals relied in *Hester*, provides the following further guidance:

[T]he purpose of the rubric "intent to claim" is to ask the same question as to whether "new matter" has been "introduced into the application for reissue" thus, perforce, indicating that the new claims are not drawn to the same invention that was originally disclosed. That inquiry is but a restatement of the question whether that which is claimed in reissue could have been claimed on the basis of the original disclosure, given that the requisite inadvertent error has been demonstrated, as is the case here. *Thus, the inquiry that must be undertaken to determine whether the new claims are "for the invention" originally disclosed, to paraphrase [In re] Rowand, [526 F.2d 558 (CCPA 1975),] is to examine the entirety of the original disclosure and decide whether, through the "objective eyes" of the hypothetical person having ordinary skill in the art, an inventor could fairly have claimed the newly submitted subject matter in the original application, given that the requisite error has been averred.* We agree with, and, in any event, are bound by, the statement in *[In re] Mead*, [581 F.2d 251 (CCPA 1978) ], quoted above, that the inquiry under § 251

---

11. Section 251 provides, in pertinent part, that upon adequate showing of "error" without deceptive intent, "the Commissioner shall ... reissue the patent for the invention disclosed in the *original patent*, and in accordance with a new

and amended application, for the unexpired part of the term of the original patent. *No new matter shall be introduced into the application for reissue."* 35 U.S.C. § 251 (emphasis added).

as to whether the new claims are for the invention originally disclosed is analogous to the analysis required by § 112 ¶ 1. Under one aspect of that analysis, a court must ascertain whether "the disclosure originally filed [conveys] to those skilled in the art that applicant had invented the subject matter later claimed." *Wilder*, 736 F.2d at 1520, 222 USPQ at 372; *see also In re Kaslow*, 707 F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed.Cir.1983); *In re Edwards*, 568 F.2d 1349, 1351, 196 USPQ 465, 467 (CCPA 1978) ("The function of the description requirement is to ensure that the inventor had possession, as of the filing date of the application relied on, of the specific subject matter later claimed by him.").

＊　　＊　　＊　　＊　　＊　　＊

*We conclude that, under both Mead and Rowand, a claim submitted in reissue may be rejected under the "original patent" clause if the original specification demonstrates, to one skilled in the art, an absence of disclosure sufficient to indicate that a patentee could have claimed the subject matter. Merely finding that the subject matter was "not originally claimed, not an object of the original patent, and not depicted in the drawing," does not answer the essential inquiry under the "original patent" clause of § 251, which is whether one skilled in the art, reading the specification, would identify the subject matter of the new claims as invented and disclosed by the patentees.* In short, the absence of an "intent," even if objectively evident from the earlier claims, the drawings, or the original objects of the invention is simply not enough to establish that the new claims are not drawn to the invention disclosed in the original patent.

*In re Amos*, 953 F.2d at 618–19 (emphasis added).

### b. *Application of the test*

█ The court concludes that Automatic's motion for summary judgment on patent invalidity on this ground must be denied, not least because of the heavy burden of proof Automatic bears. *See Rockwell Int'l Corp.*, 147 F.3d at 1362 (Fed.Cir.1998) ("the . . . determination of invalidity [on summary judgment]. . . must be predicated on facts established by clear and convincing evi-

dence"); *Laitram Corp.*, 143 F.3d at 1464–65 (where "the district court did not err in holding that [party challenging validity] could not prove invalidity by clear and convincing evidence, [the patentee] was entitled to summary judgment on this issue"); *National Presto Indus., Inc.*, 76 F.3d at 1189 ("[I]n deciding a motion for summary judgment of invalidity the [heightened] burden of proof [of clear and convincing evidence] must be considered.").

The court held above that there were, or at least there are genuine issues of material fact as to whether there were, adequate "errors" asserted upon which to seek reissue of the '240 patent. Thus, the condition *ante* of the "original patent" clause, that "the requisite error has been averred," is or may be present here. *See Amos*, 953 F.2d at 618. More importantly, the court finds that there are genuine issues of material fact as to "whether one skilled in the art, reading the specification, would identify the subject matter of the new claims as invented and disclosed by the patentees." *Id.* Dethmers has generated those genuine issues of material fact with the reports of its experts that the specifications of the '240 patent do indeed "identify the subject matter of the new claims as invented and disclosed by the patentees." The court is simply unable to hold, as a matter of law, that the specifications required the limitation of "pivot arms" in claim 1 or that use of the term "pivot block" was mandated as the only appropriate term by the specifications or the prosecution history. Therefore, Automatic's motion for summary judgment of invalidity on this ground must also be denied.

### 3. *Defective declaration*

As its final ground for summary judgment of invalidity of the Re482 patent, Automatic contends that the required declaration of the inventor or his representative in support of the application for a reissue patent is fatally defective. Specifically, Automatic contends that the declaration does not specify how or when the errors arose or occurred or how and when these errors were discovered, and that the declaration fails to address many of the changes that were made to the origi-

nal '240 patent. Furthermore, Automatic asserts that Arline Johnson provided only inadequate proof of her authority as the legal representative of the inventor, Andrew Johnson, because her certification by the clerk of court of her letters testamentary was nearly two years old at the time the PTO demanded proof of her authority. Automatic also contends that Arline Johnson was not competent to make the declaration, because she did not review and understand the contents·of the specification.

### a. Requirements of the declaration

At the time reissue of the '240 patent was sought, the regulation stating the requirements for the reissue declaration, 37 C.F.R. § 1.175, required that the declaration or oath include the following matter pertinent here:

(1) When the applicant verily believes the original patent to be wholly or partly inoperative or invalid, stating such belief and the reasons why.

(2) When it is claimed that such patent is inoperative or invalid "by reason of a defective specification or drawing," particularly specifying such defects.

(3) When it is claimed that such patent is inoperative or invalid "by reason of the patentee claiming more or less than he [or she] had the right to claim in the patent,"

distinctly specifying the excess or insufficiency in the claims.

\* \* \* \* \* \*

(5) Particularly specifying the errors relied upon, and how they arose or occurred.

(6) Stating that said errors arose "without any deceptive intention" on the part of the applicant.

37 C.F.R. § 1.175(a) (1996).[12] The Federal Circuit Court of Appeals most recently discussed the requirements for the declaration in support of reissuance of a patent in *Nupla Corp. v. IXL Mfg. Co., Inc.*, 114 F.3d 191 (Fed.Cir.1997), also relying on this version of 37 C.F.R. § 1.175:

Our case law requires a reissue application to include declarations "to specify every difference between the original and reissue claims." *In re Constant*, 827 F.2d 728, 729, 3 USPQ2d 1479, 1480 (Fed.Cir.1987)[, *cert. denied*, 484 U.S. 894, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987)]. In *Constant*, this court affirmed the decision of the United States Patent and Trademark Office, Board of Patent Appeals and Interferences ("Board"), which affirmed the examiner's rejection of a reissue application on the ground that the applicant failed to comply with 37 C.F.R. § 1.175. There, the appellant argued that the Board erred in its

---

**12.** The regulation has since been altered. It now states the following:

§ 1.175 Reissue oath or declaration.

(a) The reissue oath or declaration in addition to complying with the requirements of § 1.63, must also state that:

(1) The applicant believes the original patent to be wholly or partly inoperative or invalid by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than the patentee had the right to claim in the patent, stating at least one error being relied upon as the basis for reissue; and

(2) All errors being corrected in the reissue application up to the time of filing of the oath or declaration under this paragraph arose without any deceptive intention on the part of the applicant.

(b)(1) For any error corrected, which is not covered by the oath or declaration submitted under paragraph (a) of this section, applicant must submit a supplemental oath or declaration stating that every such error arose without any deceptive intention on the part of the applicant. Any supplemental oath or declaration required by this paragraph must be submitted before allowance and may be submitted:

(i) With any amendment prior to allowance; or

(ii) In order to overcome a rejection under 35 U.S.C. § 251 made by the examiner where it is indicated that the submission of a supplemental oath or declaration as required by this paragraph will overcome the rejection.

(2) For any error sought to be corrected after allowance, a supplemental oath or declaration must accompany the requested correction stating that the error(s) to be corrected arose without any deceptive intention on the .part of the applicant.

(c) Having once stated an error upon which the reissue is based, as set forth in paragraph (a)(1), unless all errors previously stated in the oath or declaration are no longer being corrected, a subsequent oath or declaration under paragraph (b) of this section need not specifically identify any other error or errors being corrected.

(d) The oath or declaration required by paragraph (a) of this section may be submitted under the provisions of § 1.53(f).

37 C.F.R. § 1.175 (1998).

interpretation of the regulation by requiring "every difference between the original and reissue claims" to be specified. This court rejected that appeal because the declaration addressed only one type of change, and "failed to address the remaining 'excesses and insufficiencies' as required by § 1.175(a)(3)." *Id.* The court, while noting that there was no implication that the Manual of Patent Examining Procedure ("MPEP") is binding on this court, cited MPEP § 1444 which states now, as it did then, that "[e]very departure from the original patent ... must be particularly and distinctly specified and supported in the original, or a supplemental, reissue oath or declaration under 37 C.F.R. [§ ] 1.175." MPEP § 1444 (6th ed., Rev.1, Sept. 1995); *Constant*, 827 F.2d at 729, 3 USPQ2d at 1480. The court concluded that "[a]ppellant has failed to show any error of law in the Board's application of rule 175 or in the rule's promulgation." *Constant*, 827 F.2d at 729, 3 USPQ2d at 1480.

*Nupla Corp.*, 114 F.3d at 194. Thus, the Federal Circuit Court of Appeals requires strict compliance with the regulations, which in turn strictly require that "[e]very departure from the original patent ... must be particularly and distinctly specified and supported in the original, or a supplemental, reissue oath or declaration under 37 C.F.R. [§ ] 1.175." *Id.* (quoting MPEP § 1444).

In *Nupla,* the court first noted that every claim of the patent contained at least one new limitation absent from the originally issued claims that was not explained by the declaration. *Nupla,* 114 F.3d at 194. The patentee, however, argued that some of the departures were in response to rejection by the examiner, and thus a declaration explaining such additional limitations was unnecessary, since it did not pertain to any "error" asserted. *Id.* The court was unpersuaded, concluding that the patentee, who asserted the "error" was overclaiming, not underclaiming as is the case here, "misperceives the nature and scope of the errors covered by the reissue statute and regulations." *Id.* [T]he "error" must only be the "claiming of more or less than he [or she] had a right to claim" for some excusable reason. 35 U.S.C. § 251. Leaving aside the excusa-

bility of the reason, the essence of "error" addressable in the reissue procedure is this overclaiming or underclaiming.....

The reissue regulations require full explanation of each "excess" in the original claims. As noted above, section 1.175(a)(3), the primary applicable subsection, concerns "the patentee claiming more ... than he [or she] had the right to claim in the patent" and the subsection then expressly requires that the declaration meet the test of "distinctly specifying the excess ... in the claims." Section 1.175(a)(5) then requires an explanation of the "errors relied upon, and how they arose or occurred." Finally, section 1.175(a)(6) requires an assertion that each such error arose without deceptive intent. Therefore, only if the declaration or any supplemental declaration establishes that the overclaiming or underclaiming resulted from an excusable error may reissue application claims be allowed. *If the alterations which the reissue applicant made were not to correct an "error," they could not be made during reissue....*

We therefore hold, based on the principle announced in *Constant* and the explicit requirements of 37 C.F.R. § 1.175(a)(3), (5), and (6), that when amendments correcting an overclaiming are made during reissue prosecution in response to a rejection, a patentee is obligated to file a supplementary declaration explaining the source of the overclaiming error, that it was non-deceptive and otherwise excusable, and how the amendment corrects the overclaiming. Since no declaration, either original or supplementary, explained the error resulting in the amendments to the reissue application claims to include the "tool" limitations, the declaration was insufficient. As noted above, all the reissue claims contain the "tool" limitations. Therefore, they were all properly deemed invalid.

*Nupla Corp.*, 114 F.3d at 194–95 (emphasis added).

### b. Sufficiency of the declaration

The conclusion of *Nupla* holds equally for an underclaiming, the "error" asserted here: the "error" is the underclaiming

and every alteration that the reissue applicant made was to correct that "error," or it could not be made during reissue. *Id.* Each and every such alteration must be explained in the reissue declaration pursuant to 37 C.F.R. § 1.175. *See id.* The declaration in support of the Re482 patent fails to meet these standards.

In an Office Action dated December 6, 1995, the examiner rejected the first reissue oath or declaration submitted on the following grounds:

> 1. The reissue oath or declaration filed with this application is defective because it fails to particularly specify the errors and/or how the errors relied upon arose or occurred as required under 37 C.F.R. [§] 1.175(a)(5). Included are inadvertent errors in conduct, i.e., actions taken by the applicant, the attorney or others, before the original patent issued, which are alleged to be the cause of the actual errors in the patent. This includes how and when the errors in conduct arose or occurred, as well as how and when these errors were discovered. Applicant's attention is directed to *Hewlett–Packard v. Bausch & Lomb,* 882 F.2d 1556, 11 USPQ2d 1750, 1758 (Fed.Cir.1989).
>
> Applicant has only specified how the errors in the claims arose. The reissue declaration fails to specify the errors in the **specification and abstract,** and how the errors relied upon arose or occurred.

Defendant's Evidence in Support of Statement of Uncontroverted Material Facts, Volume I, Deposition Exhibit No. 2, Bates stamp p. 000747 (emphasis in the original). Dethmers contends that the first paragraph of this rejection is a "form," while the second paragraph clearly indicates that the errors in the claims have been adequately specified; only those in the specification and abstract needed correction. The plain language of the rejection, however, is that, while *how* the errors in the claims arose may have been adequately specified, the first requirement—particular specification of the errors themselves—has not been met.

In any event, Dethmers responded to the rejection by filing a Substitute Reissue Application Declaration by Arline Johnson. *See* Defendant's Evidence in Support of Statement of Uncontroverted Material Facts, Vol. 1, Deposition Exhibit No. 2, Substitute Reissue Application Declaration on Behalf of Inventor by Personal Representative (hereinafter Substitute Declaration), Bates stamp pp. 000706–713. The Substitute Declaration stated the errors to be "in Johnson's claiming less than he had the right to claim in the patent." *Id.* at p. 2 (Bates stamp p. 707). More specifically, the Substitute Declaration states the following:

> There are two substantive errors that arose in the claims of the patent which are at issue.
>
> The first error that arose in the claims of the patent was the inclusion of the subject matter of [application] claims 2 and 3 in the amended base [application] claim 7. This subject matter was not material to the invention. This subject matter had already been disclosed in Johnson's own prior patent which was cited by the Examiner to reject [application] claims 2 and 3. Furthermore, the Examiner stated that the basis for allowability was that the prior art failed to teach the use of a pivot bolt mounted through a pivot block which allows pivotal movement of the rear portion of the apparatus about a transverse horizontal axis. This structure has nothing to do with the subject matter of [application] claims 2 and 3. Accordingly, Johnson claimed less than he had the right to claim when the subject matter of [application] claims 2 and 3 and related language were included in amended [application] base claim 7.
>
> The second error which arose in the claims was the use of the potentially structurally limiting term "pivot block" in original [application] claim 4 which the Examiner then included in his statement of reasons for allowable subject matter. It is believed that the term "pivot means" would have been equally allowable as it was Johnson's teaching of means which allows pivotal movement of the rear portion of the apparatus about a transverse horizontal axis which was novel and nonobvious over the prior art. None of the prior art patents cited in the original patent teach such means which allows for pivotal movement between a storage position, wherein the pivotal plane of the arms and bars is generally vertical, and a tow-

ing position, wherein the pivotal plane of the arms and bars is generally horizontal. Accordingly, Johnson again claimed less than he had the right to claim when [application] base claim 7 was limited to a "pivot block having upper and lower surfaces, forward and rearward ends, and opposing side surfaces...". [sic]

The errors arose because Johnson failed to appreciate the limiting effects of the above language. Such errors arose without any deceptive intent on the part of Johnson or his attorneys.

Substitute Declaration, pp. 4–5 (Bates stamp pp. 000709–710). In addition, the Substitute Declaration includes a table, reproduced here, that "summarizes how the claims submitted for reissue differ in scope from the originally issued claims":

| Claim Submitted for Reissue | Original Claim | How Claim Submitted for Reissue Differs from Original Claim |
|---|---|---|
| 1 | 1 | No requirement that pivot arms be present. No requirement for connection means to selectively connect pivot arms to a vehicle to be towed. |
| 2 | 2 | No requirement that pivot arms be present. No requirement for connection means to selectively connect pivot arms to a vehicle to be towed. |
| 3 | 3 | No requirement that pivot arms be present. No requirement for connection means to selectively connect pivot arms to a vehicle to be towed. |
| 4 | 1 | No requirement for means to lock the pivot arms and the bars in axial alignment. |
| 5 | 1 | No substantive difference in scope. |
| 6 | 1 | No requirement that pivot arms be present. No requirement for connection means to selectively pivot arms to a vehicle to be towed. A "pivot member" is required instead of a "pivot block." |
| 7 | 1 | No requirement that pivot arms be present. No requirement for connection means to selectively connect pivot arms to a vehicle to be towed. "Pivot means" required instead of a "pivot block." |
| 8 | 1 | Identical claims. |
| 9 | 2 | Identical claims. |
| 10 | 3 | Identical claims. |

Substitute Declaration, p. 6 (Bates stamp p. 711). The Substitute Declaration then lists several essentially typographical errors in the specification and abstract. *Id.* at p. 7 (Bates stamp p. 712).

The general statement of the two errors in the Substitute Declaration and the table summarizing differences in scope, however, do not comply with the requirements of *Nupla* and *Constant* that the reissue application declaration "'specify *every* difference between the original and the reissue claims.'" *Nupla Corp.*, 114 F.3d at 194 (quoting *Constant*, 827 F.2d at 729; emphasis added). At most, they identify only the "big picture," but not the bedeviling details. It cannot be said that this declaration complies with the requirement that "'[e]very departure from the original patent ... must be particularly and

distinctly specified and supported in the original, or a supplemental, reissue oath or declaration under 37 C.F.R. [§ ] 1.175.'" *Id.* (quoting MPEP § 1444; emphasis added). Nowhere does the declaration detail particularly and distinctly each and every alteration in or departure from the claims in the '240 patent. Indeed, the generalized statement of differences in scope is the antithesis of the particular and distinct statement of "every departure" required by 37 C.F.R. § 1.175 and applicable case law. Neither the written statements quoted above nor the tabular summary even attempts to identify changes to or relocation of individual limitations of the original numbered claims.

Since neither the original reissue declaration nor any supplement explains each of the

amendments addressing the underclaiming error, the declaration in this case is insufficient. *Nupla Corp.*, 114 F.3d at 195.

Nor is the Dethmers reissue patent saved by a "safe harbor" created in the *Nupla* decision, which states that invalidity does not follow from failure to disclose "only small language changes that do not affect the scope of the claims." *Nupla Corp.*, 114 F.3d at 196. The court is not relying on undeclared "small language changes," such as the correction of "rowing vehicle" with "towing vehicle," an obvious, purely typographical error. Rather, the court is relying on Dethmers's failure to comply with the strict requirements of the declaration, because Dethmers provided only summaries of the differences in scope, instead of specifications of where such differences have been articulated.

Indeed, Dethmers does not argue that every "departure" was in fact specified in the declaration. Rather, Dethmers contends that some of the departures—specifically, in the corrected drawings—did not pertain to "errors" that were the basis for reissuance. *See* 37 C.F.R. § 1.175(a)(2) ("When it is claimed that such patent is inoperative or invalid 'by reason of a defective specification or drawing,' particularly specifying such defects."). However, as noted above, the Federal Circuit Court of Appeals has already rejected such an argument. *See Nupla*, 114 F.3d at 194. In *Nupla*, the court rejected the patentee's argument that some of the departures were in response to rejection by the examiner, and thus a declaration explaining such additional limitations was unnecessary, since it did not pertain to any "error" asserted. *Id.* Like the patentee in *Nupla*, this court concludes that Dethmers has "misperceive[d] the nature and scope of the errors covered by the reissue statute and regulations." *Id.* "If the alterations which the reissue applicant made were not to correct an 'error,' they could not be made during reissue." *Nupla Corp.*, 114 F.3d at 194–95. Therefore, Dethmers was required to specifying particularly the defects in the drawings pursuant to 37 C.F.R. § 1.175(a)(2), and because Dethmers did not do so in the substi-

tute or some supplemental declaration, the patent is invalid. *Id.* at 195.

Because all of the reissue claims contain undisclosed alterations, either in their text or in supporting drawings and specifications, all are properly deemed invalid. *Id.* Consequently, Automatic is entitled to summary judgment of invalidity of the Re482 patent based on the insufficiency of the declaration of all alterations. The court is mindful of the drastic effect of such a conclusion and the heavy burden required for proof of invalidity. *See, e.g., Rockwell Int'l Corp.*, 147 F.3d at 1362 (Fed.Cir.1998) ("the ... determination of invalidity [on summary judgment]... must be predicated on facts established by clear and convincing evidence"); *Laitram Corp.*, 143 F.3d at 1464–65 (where "the district court did not err in holding that [party challenging validity] could not prove invalidity by clear and convincing evidence, [the patentee] was entitled to summary judgment on this issue"). However, the "devil" here is very much in the details required in a reissue declaration by *Nupla, Constant,* and the former version of 37 C.F.R. § 1.175, which have not been fulfilled in this case. The court finds that its determination that Dethmers has been bedeviled by those details is dictated by the *Nupla* and *Constant* line of cases. It is for the Federal Circuit Court of Appeals to clarify whether this court has misinterpreted this line of cases or to retreat from *Nupla* and *Constant* if the standards therein articulated are too restrictive.

Because the court concludes that the Re482 patent is invalid on this ground, the court will reach Automatic's other assertions of the insufficiency of the declaration only very briefly. Automatic asserts that Arline Johnson provided only inadequate proof of her authority as the legal representative of the inventor, Andrew Johnson, because her certification by the clerk of court of her letters testamentary was nearly two years old at the time the PTO demanded proof of her authority. However, the court concludes that Dethmers generated a genuine issue of material fact concerning the adequacy of the proof of representative capacity by presenting certified letters testamentary, albeit ones

nearly two years old at the time, since there is no suggestion anywhere in the record that Arline Johnson's representative capacity had somehow lapsed. Automatic also contends that Arline Johnson was not competent to make the declaration, because she did not review and understand the contents of the specification. However, genuine issues of material fact preclude summary judgment on this ground in light of Dethmers's evidence that Arline Johnson, although now suffering from memory problems, took reasonable steps to obtain advice of counsel concerning the accuracy of the declaration, and her deposition testimony that she had at one time understood the invention and attempted to refresh that understanding at the time the declaration was made.

### 4. Summary

In summary, on Automatic's motion for summary judgment on the invalidity of the Re482 patent, the court concludes that Automatic is not entitled to summary judgment on the ground that insufficient "errors" were relied upon in seeking reissuance of the '240 patent as the Re482 patent, because such errors are, or there are genuine issues of material fact as to whether they are, sufficient to support reissuance. The court also concludes that it cannot hold, as a matter of law, that the specifications required the limitation of "pivot arms" in claim 1 or that use of the term "pivot block" was mandated as the only appropriate term by the specifications or the prosecution history, such that the Re482 patent is not for the "same invention" as the original '240 patent. The court also concludes that there are genuine issues of material fact as to whether Arline Johnson submitted adequate proof of her authority to act as Andrew Johnson's representative in the reissue process and as to whether she was competent to make the necessary declaration. However, the court concludes that, as a matter of law, the reissue declaration does not comply with the detail required by the decisions in *Nupla* and *Constant*, and the

former version of 37 C.F.R. § 1.175. Therefore, Automatic's motion for summary judgment will be granted on this ground and the court will declare the Re482 patent invalid.

### E. Dethmers's Motion For Summary Judgment Of Patent Invalidity, Unenforceability, And Non-Infringement

Finally, the court turns to Dethmers's June 2, 1998, motion for summary judgment or partial summary judgment of patent invalidity, unenforceability, and non-infringement. In that motion, Dethmers first asserts that the '166 patent held by Automatic is invalid, because claims 1 through 4 were anticipated by a latching device made by Weasler Engineering, and claim 5 of the patent is obvious in light of prior art including the Weasler device. Second, Dethmers contends that the '166 patent is unenforceable because of inequitable conduct of Automatic in withholding reference to the Weasler device from the patent examiner. Third, Dethmers contends that, even if the '166 patent is valid and enforceable, Dethmers's products do not infringe the limitations of the claims in the '166 patent. Therefore, Dethmers seeks declaratory judgment that Dethmers does not infringe the '166 patent and summary judgment denying Automatic's counterclaim for infringement of the '166 patent.

Automatic contends that it is not possible to determine whether the Weasler device anticipated the '166 patent, because Dethmers has provided insufficient information about the Weasler device to allow the court to make the necessary analysis. Furthermore, Automatic contends that, because the Weasler device is for power take-offs, not tow bars, it almost certainly would not infringe the '166 patent, and thus could not have anticipated it. Automatic contends that its patent is enforceable, because the Weasler device, whatever it is, is not material to the patentability of Automatic's invention and there was no intent to deceive the PTO concerning the Weasler device. Finally, Automatic asserts that the Dethmers tow bars do infringe the '166 patent, if not literally, then under the doctrine of equivalents.

### 1. Invalidity of the '166 patent

Dethmers asserts first that the '166 patent is invalid, because claims 1 through 4 were anticipated by, and claim 5 was obvious in light of, prior art. The court concludes that genuine issues of material fact preclude summary judgment on either of these contentions.

#### a. Anticipation of claims 1 through 4 of the '166 patent

A claim is anticipated, and therefore invalid, pursuant to 35 U.S.C. § 102(b), only when a single prior art reference discloses each and every limitation of the claim. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed.Cir.1998) ("It is well settled that a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference."); *Applied Med. Resources Corp. v. United States Surgical Corp.*, 147 F.3d 1374, 1378 (Fed.Cir.1998) ("We have interpreted the statute as requiring a party seeking to invalidate a patent to prove that the allegedly invalidating patent or publication contains 'each and every element of [the] claimed invention,'" quoting *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir. 1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988)); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1363 (Fed.Cir.1998) ("Anticipation under 35 U.S.C. § 102 requires the disclosure in a single piece of prior art of each and every limitation of a claimed invention."); *In re Graves*, 69 F.3d 1147, 1151 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1124, 116 S.Ct. 1362, 134 L.Ed.2d 528 (1996); *Glaxo, Inc. v. Novopharm, Ltd.*, 52 F.3d 1043, 1047 (Fed.Cir.) (citing *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1571 (Fed.Cir.1986), *cert. denied sub nom. Stora Kopparbergs Bergslags AB v. Crucible, Inc.*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987)), *cert. denied*, 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995); *Glaverbel*, 45 F.3d at 1554 ("Anticipation requires identity of the claimed process and a process of the prior art; the claimed process, including each step thereof, must have been described or embodied, either expressly or inherently, in a single reference."); *Electro Med. Sys. v. Cooper Life Sciences*, 34 F.3d 1048, 1052 (Fed.Cir.1994) (anticipation under § 102 "requires the presence in a single prior art disclosure of each and every element of a claimed invention."); *In re Paulsen*, 30 F.3d 1475, 1478–79 (Fed.Cir.1994); *Shearing v. Iolab Corp.*, 975 F.2d 1541, 1544 (Fed.Cir. 1992) (prior art reference must "disclose in advance of [the patentee's] invention each and every element of the ... patent's claims," citing *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991)); *Continental Can*, 948 F.2d at 1267 (describing the requirement of § 102(a) as a "statutory requirement that a patented invention be 'new'"); *Scripps Clinic*, 927 F.2d at 1576; *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677 (Fed. Cir.1988). Thus, the classic test of anticipation was first articulated in *Peters v. Active Mfg. Co.*, 129 U.S. 530, 9 S.Ct. 389, 32 L.Ed. 738 (1889), as follows: "That which infringes, if later, would anticipate, if earlier." *Peters*, 129 U.S. at 537, 9 S.Ct. 389.

Whether prior art is anticipating is a question of fact. *Rockwell Int'l Corp.*, 147 F.3d at 1363. "A party seeking to prove anticipation must do so with clear and convincing evidence because the patent must be presumed valid." *Applied Med. Resources Corp.*, 147 F.3d at 1378. Thus, "the ... determination of invalidity [on summary judgment] ... must be predicated on facts established by clear and convincing evidence." *Rockwell Int'l Corp.*, 147 F.3d at 1362; *Laitram Corp.*, 143 F.3d at 1464–65.

The disclosure of the prior art need not be express, but may inherently anticipate the patented invention where the inherent anticipation would be appreciated by one of ordinary skill in the art. *Glaxo*, 52 F.3d at 1047 (citing *Continental Can*, 948 F.2d at 1268); *Glaverbel*, 45 F.3d at 1554; *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed.Cir. 1991), *cert. denied*, 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992); *Scripps Clinic*, 927 F.2d at 1576. However, if no single prior art reference anticipates each and every claim,

**1028**

but a combination thereof possibly does, the proper inquiry is obviousness, not lack of novelty. *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1548 (Fed.Cir.1983).

■ Here, the court concludes that genuine issues of material fact preclude summary judgment on the question of anticipation of the '166 patent by the Weasler device, largely because Dethmers has failed to provide the court with sufficient information to evaluate precisely what is the alleged Weasler device. *See Glaverbel,* 45 F.3d at 1560 (the party seeking summary judgment " 'always bears the initial responsibility of informing the district court of the basis for its motion,' " quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *Conroy,* 14 F.3d at 1575; *Copelands' Enters., Inc. v. CNV, Inc.,* 945 F.2d 1563, 1565 (Fed.Cir.1991). This is so, notwithstanding the various portions of deposition testimony by the inventors of the '166 patent Dethmers has cited as purportedly demonstrating the extent to which the '166 patent was "inspired" by the Weasler device and that the inventors of the '166 patent could only identify the number of locking balls, the fact that the Weasler device is detachable from the inner tube, and that the devices are of different sizes as the salient differences between the Weasler device and their own. This is also so, notwithstanding Dethmers's supplementation of the summary judgment record with a diagram of a "tractor yoke" made by Weasler, when it is unclear whether this "Weasler device" is indeed the one to which the inventors of the '166 patent referred in their depositions. *Glaverbel,* 45 F.3d at 1560 (The moving party must " 'identify[ ] those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact,' " quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, which in turn cites *Fed.R.Civ.P.* 56(c)); *Conroy,* 14 F.3d at 1575 ("The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather discharge[s] its burden by showing the district court that there is an absence of evidence to support the nonmov-

ing party's case."). There may be an absence of a genuine issue of material fact that the Weasler device was an "inspiration," and even no genuine issue of material fact that the differences identified by the inventors between it and their own invention were few, but that does not establish that there is no genuine issue of material fact that the Weasler device discloses each and every limitation of claims 1 through 4 of the '166 patent, when the precise nature of the Weasler device is unclear. *Celeritas Techs., Ltd.,* 150 F.3d at 1361 ("It is well settled that a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference."); *Applied Med. Resources Corp.,* 147 F.3d at 1378. To meet that requirement in the circumstances of this case to the high standard of proof required for invalidity, this court believes, requires evidence allowing a detailed comparison of the two devices. *See Applied Med. Resources Corp.,* 147 F.3d at 1378 ("A party seeking to prove anticipation must do so with clear and convincing evidence because the patent must be presumed valid."); *Rockwell Int'l Corp.,* 147 F.3d at 1362 ("[T]he … determination of invalidity [on summary judgment]… must be predicated on facts established by clear and convincing evidence."); *Laitram Corp.,* 143 F.3d at 1464–65. Such evidence is not in the record here.

### b. *Obviousness of claim 5 of the '166 patent*

■ The Federal Circuit Court of Appeals recently explained obviousness and how a determination of obviousness is made:

> Under 35 U.S.C. § 103(a),
>
> [a] patent may not be obtained … if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In determining obviousness, the invention must be considered as a whole without the benefit of hindsight, and the claims must

be considered in their entirety. *See W.L. Gore & Assocs. v. Garlock, Inc.,* 721 F.2d 1540, 1551, 220 U.S.P.Q. 303, 312–13 (Fed. Cir.1983); *see also Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567, 220 U.S.P.Q. 97, 101 (Fed.Cir.1983). Throughout the obviousness determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts, *see Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1555, 33 U.S.P.Q.2d 1496, 1499 (Fed.Cir.1995); *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 716, 21 U.S.P.Q.2d 1053, 1055 (Fed. Cir.1991).

*Rockwell Int'l Corp.,* 147 F.3d at 1364. Therefore, the court is mindful that, even on summary judgment, obviousness must also be proved by clear and convincing evidence. *See id.; Glaverbel,* 45 F.3d at 1555 (invalidity based on obviousness must be established by clear and convincing evidence); *Therma–Tru Corp. v. Peachtree Doors, Inc.,* 44 F.3d 988, 992 (Fed.Cir.1995) (same); *see also National Presto Indus., Inc.,* 76 F.3d at 1189 ("in deciding a motion for summary judgment of invalidity the [heightened] burden of proof [of clear and convincing evidence] must be considered."); *Gasser Chair Co.,* 60 F.3d at 772 (in order for the court to grant summary judgment, "there must ... be no genuine issue of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered."). The court is also mindful that the teaching of prior art upon which an obviousness determination is made is a question of *fact,* although the ultimate determination of obviousness is a question of *law. In re Napier,* 55 F.3d 610, 613 (Fed.Cir.1995). "The factual predicates underlying an obviousness determination include the scope and content of the prior art, the differences between the prior art and the claimed invention, and the level of ordinary skill in the art." *In re Rouffet,* 149 F.3d 1350, 1355 (Fed.Cir.1998); *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 881 (Fed.Cir.1998).

" 'As obviousness can be established on the basis of the combined teachings of references, we think it is clear that simple enhancements of existing prior art ... do not constitute a substantial difference between the subject matter claimed in the ... patent and that of the prior art.' " *Continental Can Co.,* 948 F.2d at 1273 (quoting the lower court). However, "there must be some reason for the combination other than the hindsight gleaned from the invention itself." *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138 (Fed.Cir.1985). More recently, the Federal Circuit Court of Appeals has provided a succinct statement of the test and standards for a determination of obviousness in relation to combined teachings that individually may suggest separate modifications found together in the patent in suit:

When a rejection [for obviousness] depends on a combination of prior art references, there must be some teaching, suggestion, or motivation to combine the references. *See In re Geiger,* 815 F.2d 686, 688, 2 U.S.P.Q.2d 1276, 1278 (Fed. Cir.1987). Although the suggestion to combine references may flow from the nature of the problem, *see Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1573, 37 U.S.P.Q.2d 1626, 1630 (Fed.Cir.1996), the suggestion more often comes from the teachings of the pertinent references, *see In re Sernaker,* 702 F.2d 989, 994, 217 U.S.P.Q. 1, 5 (Fed.Cir.1983), or from the ordinary knowledge of those skilled in the art that certain references are of special importance in a particular field, *see Pro–Mold,* 75 F.3d at 1573 (citing *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 297 n. 24, 227 U.S.P.Q. 657, 667 n. 24 (Fed.Cir. 1985)). Therefore, "[w]hen determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.' " *See In re Beattie,* 974 F.2d 1309, 1311–12, 24 U.S.P.Q.2d 1040, 1042 (Fed.Cir.1992) (quoting *Lindemann Maschinenfabrik*

GMBH v. American Hoist & Derrick Co., 730 F.2d 1452, 1462, 221 U.S.P.Q. 481, 488 (Fed.Cir.1984)).

In re Rouffet, 149 F.3d at 1355–56; Napier, 55 F.3d at 613.

■ Again, the court concludes that genuine issues of material fact preclude summary judgment in Dethmers's favor on its assertion of the obviousness of claim 5 of the '166 patent, because, without sufficient evidence of the Weasler device, it is impossible to determine whether the "factual predicates underlying an obviousness determination," such as "the scope and content of the prior art [and] the differences between the prior art and the claimed invention," see In re Rouffet, 149 F.3d at 1355; Monarch Knitting Mach. Corp., 139 F.3d at 881, have been established beyond a genuine dispute, let alone whether combining the Weasler device with other prior art would make claim 5 obvious to a person of ordinary skill in the art, or whether there is some teaching, suggestion, or motivation to combine the references. In re Rouffet, 149 F.3d at 1355–56. Therefore, Dethmers is not entitled to summary judgment on the obviousness of claim 5 in light of prior art including the Weasler device.

### 2. Unenforceability owing to inequitable conduct

■ Dethmers's second contention in its motion for summary judgment is that the '166 patent is unenforceable, because of inequitable conduct by Automatic in withholding reference to the Weasler device from the patent examiner. Dethmers asserts that the inventors of the '166 patent acknowledged in their depositions that the Weasler device was material to, and should have been disclosed in, their patent application. Dethmers also contends that the record shows that the Weasler device was withheld from the PTO with the intent to deceive. Automatic counters that the Weasler device does not compel the conclusion that the claims of the '166 patent are unpatentable and that the patent examiner considered other power take-offs and found them irrelevant to the patentability of the Automatic invention; in-

deed, Automatic contends that power take-offs are not even in the same art as its invention. Finally, Automatic argues that there is no intent to deceive apparent from the record.

The Federal Circuit Court of Appeals recently discussed the meaning of "inequitable conduct" and the steps in the analysis of such a claim:

Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. See Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068–71, 46 U.S.P.Q.2d 1097, 1105–06 (Fed.Cir.1998) (citing Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1826 (Fed.Cir. 1995)). Determination of inequitable conduct requires a two step analysis. First, the trial court must determine whether the withheld reference meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO. See Halliburton Co. v. Schlumberger Technology Corp., 925 F.2d 1435, 1439, 17 USPQ2d 1834, 1838 (Fed.Cir.1991). These threshold determinations are reviewed by this court under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed. Cir.1988) (in banc). Once the threshold levels of materiality and intent have been established, the trial court is required to weigh materiality and intent. See Molins, 48 F.3d at 1178. The more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred. See N.V. Akzo v. E.I. Dupont de Nemours, 810 F.2d 1148, 1153, 1 USPQ2d 1704, 1708 (Fed.Cir.1987). In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable. See La-Bounty Mfg., Inc. v. United States Int'l Trade Comm'n, 958 F.2d 1066, 1070, 22

USPQ2d 1025, 1028 (Fed.Cir.1992). We review the district court's ultimate determination of inequitable conduct under an abuse of discretion standard. *See Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1541, 41 USPQ2d 1829, 1834 (Fed.Cir.1997); *Halliburton*, 925 F.2d at 1440; *Kingsdown*, 863 F.2d at 876.

*Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed.Cir.1998); *accord Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1383 (Fed.Cir.1998) (stating the same standards).

### a. Materiality

In *Baxter International*, the Federal Circuit Court of Appeals also explained the meaning of "materiality," the first step in the analysis: "A reference is deemed material if there is a 'substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.'" *Id.* (quoting *Halliburton*, 925 F.2d at 1440, in turn quoting 37 C.F.R. § 1.56 (1989)). "However," the Federal Circuit Court of Appeals observed, "we also note that a patentee need not cite an otherwise material reference to the PTO if that reference is merely cumulative or is less material than other references already before the examiner." *Id.* at 1328.[13] The court then offered this further caution:

A difference in a single element, however important to the patented invention, is not automatically dispositive of the issue of materiality.... References lacking different elements are often combined to reject an application under 35 U.S.C. § 103. Simply because [a device] lacked a [certain element] does not make it likely that a reasonable examiner would consider the reference unimportant in deciding whether to allow the patent. In other words, materiality is not analyzed in a vacuum. It is not dependent on a single element viewed in isolation. Rather, it is judged based upon the overall degree of similarity between the omitted reference and the

claimed invention in light of the other prior art before the examiner. *See Halliburton*, 925 F.2d at 1441–42.

*Baxter Int'l, Inc.*, 149 F.3d at 1328.

Once again, this element is dependent upon the precise nature of the Weasler device, so that the court can judge "the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner." *Id.* However, sufficient evidence of the nature of the Weasler device cannot be found in the record. Therefore, genuine issues of material fact dog every step of the analysis of inequitable conduct, precluding summary judgment in Dethmers's favor on the "threshold" question of the level of materiality, *id.* at 1327, as well as on the "weighing" of this element against intent. Therefore, genuine issues of material fact preclude summary judgment in Dethmers's favor on the ground that the '166 patent is unenforceable owing to inequitable conduct. FED.R.CIV.P. 56(c).

### b. Intent to deceive

Consideration of the "intent to deceive" element leads to the same conclusion. In *Baxter International*, the court also explained the requirements of the "intent to deceive" element of the analysis of a claim of inequitable conduct:

Intent need not be proven by direct evidence. Indeed, "[d]irect proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances." *LaBounty*, 958 F.2d at 1076; *see Paragon Podiatry Laboratory, Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189–90, 25 USPQ2d 1561, 1567 (Fed.Cir.1993) (explaining that intent must be generally inferred from the facts and circumstances surrounding the applicant's conduct). Our prior decisions are also clear that although intent may be inferred from circumstantial evidence, mere gross negligence is insufficient to

---

**13.** The Federal Circuit Court of Appeals recognized that "this standard reflects an older PTO rule in effect at the time the instant patents were prosecuted and that the current PTO rule defines materiality differently." *Id.* at 1328 n.3.

justify an inference of an intent to deceive the PTO. *See Kingsdown,* 863 · F.2d at 876; *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 n. 9, 5 USPQ2d 1112, 1116 n. 9 (Fed.Cir.1987). In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference. *See Molins,* 48 F.3d at 1181.

*Baxter Int'l, Inc.,* 149 F.3d at 1329; *Akron Polymer Container Corp.,* 148 F.3d at 1383. Thus, "the challenged 'conduct must be sufficient to require a finding of deceitful intent in the light of all the circumstances.'" *Akron Polymer Container Corp.,* 148 F.3d at 1383 (quoting *Kingsdown Med. Consultants v. Hollister, Inc.,* 863 F.2d 867, 873, 9 U.S.P.Q.2d 1384, 1389 (Fed.Cir.1988))

Although "[t]he more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred," *Baxter Int'l, Inc.,* · 149 F.3d at 1329; *Akron Polymer Container Corp.,* 148 F.3d at 1383, the quantum of evidence of intent required here is uncertain where materiality is genuinely in dispute. Furthermore, the parties have vigorously argued the evidence of intent, or lack of it, and the inferences to be drawn therefrom. The court may be persuaded that failure to disclose to the PTO the device the inventors describe as their "inspiration" smacks of intent to deceive, but for the court to make a determination on the evidence presently in the record, would require the court to act on its weighing of the evidence: the court can no more make the "threshold" determination of "intent to deceive" than it could make the threshold determination of materiality. *Baxter Int'l, Inc.,* 149 F.3d at 1327. It cannot be said that "no 'reasonable [factfinder] could return a verdict for the nonmoving party'" on the issue of Automatic's alleged "intent to deceive" in failing to disclose the Weasler reference, *Nike, Inc.,* 43 F.3d at 646 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505), because a reasonable jury could be persuaded that the facts show Automatic reasonably believed the Weasler device, however "inspirational," was not material, because it was from a different art, or was less material than other art already disclosed to the PTO. *Cf. Baxter Int'l, Inc.,* 149 F.3d at 1328. Hence, summary judgment is not appropriate on this element of the analysis or indeed on Automatic's patent infringement claim on the ground of unenforceability of the '166 patent.

### 3. Non-infringement

Finally, Dethmers contends that, even if the '166 patent is valid and enforceable, Dethmers's products do not infringe the limitations of the claims in the '166 patent. Dethmers asserts that three specific limitations of claim 1 of the '166 patent are not present in its tow bars: (1) the EXCALI–BAR does not have a groove that "circularly surrounds" the inner tube; (2) the EXCALI–BAR does not have a spring means located between a cover member and a medially located cam portion of the slidable latch; and (3) the EXCALI–BAR does not have a cover over the trailward portion of its slidable latch member. Automatic · contends that Dethmers's EXCALI–BAR does infringe each of these limitations of claim 1 of its patent, either literally, or pursuant to the doctrine of equivalents. In reply, Dethmers contends that prosecution history estoppel or some other defense bars assertion of infringement pursuant to the doctrine of equivalents and there is no literal infringement of the '166 patent by Dethmers's tow bars.

### a. Literal and "doctrine of equivalents" infringement

"Infringement, both literal and under the doctrine of equivalents, is a question of fact which we review for clear error when tried to the court." *Insituform Techs., Inc. v. Cat Contracting, Inc.,* 156 F.3d 1199, 1203 (Fed.Cir.1998). Before the court can begin an assessment of infringement, however, it must first construe the claims of the patent, and claim construction is a. question of law · for the court. *Enercon GmbH v. International Trade Comm'n,* 151 F.3d 1376, 1376 (Fed.Cir.1998) ("Claim construction is a matter of law and is reviewed by this court de novo."); *Cybor Corp. v. FAS Technolo-*

*gies, Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (*in banc*); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (*in banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

 **i. Rules of claim construction.** The Federal Circuit Court of Appeals has stated,

> Proper claim construction requires an examination of the claim language, the written description, and, if relevant, the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). The appropriate starting point, however, is always with the language of the asserted claim itself. *See id.; Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620, 34 USPQ2d 1816, 1819 (Fed.Cir.1995).

*Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998). "Claims terms are also to be interpreted so as to give the terms their ordinary meaning, absent some clear special definition." *Enercon GmbH,* 151 F.3d at 1384; *Vitronics,* 90 F.3d at 1582; *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed. Cir.1996). Furthermore,

> [L]imitations from the specification are not to be read into the claims, *see e.g., E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir.1988).... We have previously stated that "[w]hile ... claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland,* 847 F.2d 1573, 1581, 6 USPQ2d 2020, 2027 (Fed.Cir. 1988); *see Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563, 231 USPQ 833, 835 (Fed. Cir.1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim

from the specification. *See, e.g.,* 1 DONALD S. CHISUM, CHISUM ON PATENTS § 3.02[1] & n.12 (rel. Dec. 1996) ("The line between interpreting claim language in light of the specification and reading a limitation from the specification into the claim is a fine one.").

*Comark Communications, Inc.,* 156 F.3d at 1182, 1184; *Enercon GmbH,* 151 F.3d at 1384 ("This court has repeatedly stated that while claims are to be construed in light of the specification, they are not necessarily limited by the specification. *See Markman,* 52 F.3d at 980.").

 **ii. Literal infringement.** The Federal Circuit Court of Appeals recently explained literal infringement as follows:

> To establish literal infringement, a plaintiff must demonstrate that every limitation in the claim is literally met by the accused device. *See Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388–89, 21 U.S.P.Q.2d 1383, 1387 (Fed.Cir.1992); *Key Mfg. Group, Inc. v. Microdot, Inc.,* 925 F.2d 1444, 1449, 17 U.S.P.Q.2d 1806, 1810 (Fed.Cir.1991). Demonstration that every limitation of the claim is literally met by the accused device must be shown by a preponderance of the evidence. *See Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758, 221 U.S.P.Q. 473, 477 (Fed.Cir. 1984).

*Enercon GmbH,* 151 F.3d at 1384; *accord Strattec Security Corp. v. General Automotive Specialty Co.,* 126 F.3d 1411, 1418 (Fed. Cir.1997) (stating that literal infringement of a claim exists when every limitation recited in the claim is found in the accused device). The court in *Enercon* also explained the process for analysis of claims of literal infringement:

> In determining whether there has been literal infringement, a two step analysis is required. First, the claims must be correctly construed to determine the scope of the claims. Second, the claims must be compared to the accused device. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 34 U.S.P.Q.2d 1321, 1326 (Fed.Cir.1995) (*in banc*), *aff'd,* 517 U.S.

370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82, 39 U.S.P.Q.2d 1573, 1576 (Fed.Cir.1996). *Id.; Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998) (articulating the same two-step analysis). As the court observed above, the first step in this analysis is a question of law. The second step, however, determining whether a particular device infringes a properly construed claim, "is a question of fact." *Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1315. "As such, it is amenable to summary judgment where, *inter alia,* no reasonable fact finder could find infringement." *Id.* (citing *Warner–Jenkinson Co.,* 520 U.S. 17, 117 S.Ct. at 1053 n. 8).

■■■■ *iii. Doctrine of equivalents infringement.* Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1045; *Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1315 (quoting *Warner–Jenkinson* ); *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed.Cir.1997) ("A device that does not literally infringe a claim may nonetheless infringe ... if every element is literally or equivalently present in the accused device."). Consequently, "[a]n accused device may infringe under the doctrine of equivalents only if it possesses all of the limitations of the relevant claim either literally or equivalently." *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1160 (Fed.Cir.1998) (citing *Warner–Jenkinson Co.,* 520 U.S. 17, 117 S.Ct. at 1054); *Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1315 ("Infringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially.").

■■■■ " 'In applying the doctrine of equivalents, it is often enough to assess whether the claimed and accused products or processes included substantially the same function, way, and result.' " *Insituform Technologies, Inc.,* 156 F.3d at 1203 (quoting *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512, 1518 (Fed.Cir. 1995) (*in banc* ), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). More specifically,

> Whether an element of the accused device is equivalent to a claim limitation depends on "whether the substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." [*Warner–Jenkinson Co.,* 520 U.S. 17, 117 S.Ct. at 1054.] If a theory of equivalence would vitiate a claim limitation, however, then there can be no infringement under the doctrine of equivalents as a matter of law. *See id.,* 520 U.S. 17, 117 S.Ct. at 1049, 1053 n. 8.

*Tronzo,* 156 F.3d at 1160; *Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1315 ("Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination.").

Turning to the evidence required to support an equivalence argument, the Federal Circuit Court of Appeals has observed as follows:

> [M]ere generalized testimony as to equivalence is insufficient as a matter of law to support a jury verdict finding infringement under the doctrine of equivalents. *See Texas Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567, 39 USPQ2d 1492, 1499 (Fed.Cir.1996) ("Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice [to show infringement under the doctrine of equivalents]."). We have also previously stated that "[t]he evidence and argument on the doctrine of equivalents cannot be merely subsumed in plaintiff's case of literal infringement." *Lear*

*Siegler,* 873 F.2d at 1425. Rather, "a patentee must prove substantial identity as to each of the function, way and result prongs of the doctrine of equivalents." *Malta,* 952 F.2d at 1327. The thrust of these cases is to ensure that a jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent.

*Comark Communications, Inc.,* 156 F.3d at 1188.

■ The doctrine of equivalents must be applied with care, however:

"The doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1048, 137 L.Ed.2d 146. Nonetheless, infringement under the doctrine of equivalents remains a viable basis for a finding of infringement, *see id.* at ——, 117 S.Ct. at 1054 ("Today, we adhere to the doctrine of equivalents."), as long as a court properly applies (1) the so-called "All Elements" rule, *see id.* ("The determination of equivalence should be applied as an objective inquiry on an element-by-element basis."); *see also Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935, 4 USPQ2d 1737, 1739–40 (Fed.Cir.1987) (*in banc* ), and (2) the doctrine of prosecution history estoppel, *see Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1049, 137 L.Ed.2d 146 ("Prosecution history estoppel continues to be available as a defense to infringement.").

*Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1316. The "All Elements" rule endorsed by the Supreme Court requires that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1049; *Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1454 (Fed.Cir.1998); *Hughes Aircraft Co. v. United States,* 140 F.3d 1470, 1474 (Fed.Cir.1998). Therefore,

[i]n applying [the doctrine of equivalents], the Court cautioned against a range of equivalents with "such broad play as to effectively eliminate that element in its entirety." [*Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1049.] The essential inquiry is whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Id.* at ——, 117 S.Ct. at 1054.

*Litton Sys., Inc.,* 140 F.3d at 1454; *Hughes Aircraft Co.,* 140 F.3d at 1474.

■ Dethmers has asserted that the second limitation on the doctrine of equivalents, prosecution history estoppel, is applicable here, so this court must explore this defense further. As the Federal Circuit Court of Appeals recently explained,

In *Warner–Jenkinson,* the Supreme Court changed some aspects of the law of prosecution history estoppel. However, the extent of this change was limited. Honeywell argues that *Warner–Jenkinson* held that if a claim element has been added by amendment for reasons of patentability, prosecution history estoppel automatically bars all equivalents for that element, regardless of whether the administrative record before the Patent and Trademark Office (PTO) shows that the applicant surrendered all coverage beyond the literal claim scope. Honeywell's position, however, would both bar after-arising equivalents expressly approved by the Supreme Court and bar any equivalents whatsoever to the vast majority of claim limitations amended during patent prosecution.

This court determines in this opinion that the Supreme Court did not in fact effect such a sweeping change. Instead the Supreme Court adhered to the longstanding doctrine that an *estoppel only bars recapture of that subject matter actually surrendered during prosecution.* The common practice of amending a claim during prosecution, even amending to overcome prior art, does not necessarily surrender all subject matter beyond the

literal scope of the amended claim limitation.

*Litton Sys., Inc.,* 140 F.3d at 1454 (emphasis added). In *Warner–Jenkinson,* "the Court reaffirmed that the reason for claim amendments remains relevant to application of an estoppel." *Id.* at 1456 (citing *Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1050). Furthermore,

> the Court established a presumption that when an applicant narrows a claim element during prosecution, a trial court should presume that the applicant did so for a reason related to patentability. [*Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1054]. Consequently, where a patent owner cannot show a reason for the amendment other than patentability, "a court should presume that the purpose behind the ... amendment is such that prosecution history estoppel would apply." *Id.,* 520 U.S. 17, 117 S.Ct. at 1054. Thus, the Supreme Court articulated an additional rule to trigger, in applicable circumstances, prosecution history estoppel.

*Litton Sys., Inc.,* 140 F.3d at 1456. Prosecution history estoppel also applies in the following circumstances:

> Although not automatically erecting an estoppel, an amendment made for reasons other than patentability may still give rise to an estoppel. This court has acknowledged that even arguments made during prosecution without amendments to claim language—if sufficient to evince a clear and unmistakable surrender of subject matter—may estop an applicant from recapturing that surrendered matter under the doctrine of equivalents. *See Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 952, 28 USPQ2d 1936, 1939 (Fed.Cir.1993). Estoppel by clear and unmistakable surrender without claim amendments may arise even when the arguments to the examiner were not necessary to distinguish prior art. *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174–75, 26 USPQ2d 1018, 1025 (Fed.Cir.1993). This principle presupposes that the applicant has made the surrender unmistakable enough that the pub-

lic may reasonably rely on it. By logical extension, if an applicant makes an amendment unrelated to patentability which evinces an unmistakable surrender, that action will preclude recapture of the surrendered subject matter under the doctrine of equivalents.

*Litton Sys., Inc.,* 140 F.3d at 1458.

Again, Dethmers asserts that three specific limitations of claim 1 of the '166 patent are not literally infringed by its tow bars and that doctrine of equivalents infringement of these limitations are barred. The court will consider each of these limitations in turn. The court will at times refer to the illustrations of the EXCALI–BAR tow bar that appear in Section I.B.4. of this ruling beginning on page 25.

#### b. The groove

First, Dethmers contends that its EXCALI–BAR tow bar does not have a groove that "circularly surrounds" the inner tube as required by the '166 patent. The pertinent limitation of the '166 patent is the following:

What is claimed is as follows:

> 1. Arrestably Lockable Telescoping Tow–Bar Assembly comprising:
>
> (A) an inner-tube having an outer-surface concentrically surrounding a directionally longitudinally extending central-axis and having a trail-end directionally transversely intersecting said central-axis, *said outer-surface being provided with at least one radially inwardly extending inward-groove circularly surrounding said central-axis and located in a plane perpendicular to said central-axis* [.]

Patent No. '166, claim 1 (emphasis added). Dethmers contends that the proper interpretation of this limitation is that "circularly surrounding" means that the groove forms a complete 360–degree circle around the inner tube. However, on Dethmers's EXCALI–BAR, the grooves (plural) only partially encircle the inner bar. *See* "exploded" view, page 27 (at handwritten "A"). Automatic

counters that a proper interpretation of the phrase "inward-groove circularly surrounding said central-axis" in claim 1 of the '166 patent is a groove that does not intersect the central axis, but defines the boundaries of a circle, either contiguously or non-contiguously, around the central axis. Automatic contends that the grooves on the EXCALI–BAR literally meet this limitation, because the grooves do define the boundaries of a circle.

### ▮ i. Claim interpretation and literal infringement.

As explained above, "[p]roper claim construction requires an examination of the claim language, the written description, and, if relevant, the prosecution history," see *Comark Communications, Inc.*, 156 F.3d at 1186, and "[t]he appropriate starting point ... is always with the language of the asserted claim itself." *See id.* The claim language here leaves the court in no doubt that what was actually claimed was *a single continuous groove describing a complete circle around the inner tube.* "Circularly," in the first instance, suggests a continuous, complete circle, because the term "circular" means "having the form of a circle: round," or "describing a circle or spiral." *See, e.g.,* WEBSTER'S COLLEGIATE DICTIONARY (10th ed.). Although the parties have concentrated on the meaning of "circularly," each finding support in dictionary definitions for its interpretation, they have not apparently considered the effect of "circularly *surrounding,*" which makes plain that the groove, in the form of a circle, is "to enclose on all sides" the inner tube. *See, e.g.,* WEBSTER'S COLLEGIATE DICTIONARY (10th ed.). "Claims terms are ... to be interpreted so as to give the terms their ordinary meaning, *absent some clear special definition.*" *Enercon GmbH*, 151 F.3d at 1384 (emphasis added); *Vitronics*, 90 F.3d at 1582; *Athletic Alternatives*, 73 F.3d at 1578. Automatic did *not* give "some clear special definition" to "circularly surrounding," such as defining it to mean a groove or series of grooves that describe or define a complete or partial circle about the central-axis of the inner tube. Although Automatic asserts that it is improper to add qualifying terminology to a claim that is not contained in the claim itself, citing *Hoganas AB v. Dresser Indus., Inc.*, 9

F.3d 948, 950 (Fed.Cir.1993), when arguing that Dethmers reads the limitation to be "*completely* circularly surrounding" the inner tube, it is equally improper for Automatic to argue that the absence of a qualifier means that the limitation meant "*completely and partially* circularly surrounding." Addition of "completely" would simply be redundant; it is addition of the further qualifier "and partially" that is improper.

Nor does use of the language "at least one ... inward-groove" cover a series of grooves that together define a circle about the inner tube. Rather, it is clear that "at least one" means that *each* of the grooves must have all of the characteristics that follow, *i.e., each* must be a *single continuous groove describing a complete circle around the inner tube.* In other words, there could be a series of such grooves spaced along the inner tube to provide for various locking positions for various extensions of the telescoping locking arms.

Looking briefly at the written description, *see Comark Communications, Inc.*, 156 F.3d at 1186 ("Proper claim construction requires an examination of the claim language, *the written description*, and, if relevant, the prosecution history;" emphasis added), the court notes that "circularly surrounding" is also used to describe the inner and outer "tubes" and their inner and outer surfaces, plainly complete cylinders. In the face of what the court finds to be the plain, ordinary meaning of the language of the claim, and support for that interpretation from the description, the court does not find Automatic's assertions of different terminology used in prior art to define continuous grooves completely encircling a tube to be relevant. *See id.* ("Proper claim construction requires an examination of the claim language, the written description, and, *if relevant,* the prosecution history;" emphasis added).

Thus, the EXCALI–BAR, which has at least two grooves that together define no more than a 240–degree arc of a circle around the inner tube, does not literally infringe this limitation of claim 1 of the '166 patent as a matter of law.

**■** *ii. "Equivalents" infringement and estoppel.* Dethmers contends that Automatic is precluded from asserting that the EXCALI–BAR nonetheless infringes this limitation of claim 1 under the doctrine of equivalents, because the "circularly surrounding" limitation was added in an amendment in response to a rejection by the Examiner, and without explanation, the change is presumed to be to overcome prior art, citing *Warner–Jenkinson*, 520 U.S. 17, 117 S.Ct. at 1051. Automatic, however, asserts that the groove on the Dethmers tow bar is the equivalent of the groove claimed in claim 1 of the '166 patent, because the function of both grooves is to engage an element prohibiting relative movement of the tubes, the function is carried out in the same way, by an indentation in the inner tube, and the result of both means is that they prohibit the relative movement of the inner and outer tubes. Automatic disputes that prosecution history estoppel precludes assertion of this "equivalents" infringement, because the language used was a mere substitution that had nothing to do with patentability.

In the absence of some sort of estoppel, the court would also conclude that the EXCALI–BAR does infringe this limitation of the '166 patent under the doctrine of equivalents, as a matter of law. The court finds that the grooves on the EXCALI–BAR are "equivalents" to this limitation of the '166 patent, because, as Automatic argues, " 'the substitute element matches the function, way, and result of the claimed element,' " and plainly does not " 'play[ ] a role substantially different from the claimed element.' " *Tronzo*, 156 F.3d at 1160 (quoting *Warner–Jenkinson*, 520 U.S. 17, 117 S.Ct. at 1054); *Comark Communications, Inc.*, 156 F.3d at 1188–89; *Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1315. Indeed, Dethmers has not argued otherwise, instead founding its motion for summary judgment of non-infringement of this limitation under the doctrine of equivalents on the unavailability of that doctrine by reason of prosecution history estoppel.

However, Automatic has generated a genuine issue of material fact on the applicability of prosecution history estoppel by coming forward with evidence that the amendment first using "inward-groove circularly surrounding" was simply to replace the phrase "indentation arrayed about" in the interest of clarity, not to overcome any prior art rejection. The court acknowledges that there is a presumption that where a patent owner cannot show a reason for the amendment other than patentability, "a court should presume that the purpose behind the … amendment is such that prosecution history estoppel would apply." *Warner–Jenkinson*, 520 U.S. 17, 117 S.Ct. at 1054; *Litton Sys., Inc.*, 140 F.3d at 1456. However, that presumption is not irrebutable. *See Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 114 F.3d 1161, 1163 (Fed.Cir.1997) (*per curiam*) (appellate decision upon remand from the Supreme Court remanding to the district court to determine whether the presumption established by the Supreme Court could be rebutted by the patentee). Furthermore, although "an amendment made for reasons other than patentability may still give rise to an estoppel," the court cannot find on this record that there is the necessary "clear and unmistakable surrender" of equivalents to the literal terms of this limitation. *See Litton Sys., Inc.*, 140 F.3d at 1458. Therefore, Dethmers' motion for summary judgment of non-infringement must be denied as to this limitation.

#### c. *The spring location*

Next, Dethmers contends that its EXCALI–BAR does not have a spring means located between a cover member and a medially-located cam portion of the slidable latch as required by the '166 patent. The pertinent limitation of the '166 patent is the following:

What is claimed is as follows:

1. Arrestably Lockable Telescoping Tow–Bar Assembly comprising:

 * * * * * *

 (E) helical spring means surrounding the outer-tube and actuatably extending directionally longitudinal between the cover member and the

slidable latch member medially-located cam portion.

Patent No. '166, claim 1. Dethmers interprets this limitation to require a helical spring to be in place between the cover and the medially-located cam portion of the slidable latch member. Dethmers contends that its tow bar does not have "a medially-located cam," [14] so that the helical spring used in its tow bar is not located between such a cam and a cover member. Instead of a "cam," the allegedly infringing element is shown in the "exploded" view on page 27 as part 31, and it is identified in the parts list as a "Lock Collar." It is also shown in Figures 4a, 4b, 6a, and 6b on pages 28 and 29, respectively, as part 84. Automatic insists that this part of the EXCALI–BAR is indeed a "cam," and that it is located near the middle of the Dethmers latch assembly. Automatic also contends that the proper interpretation of this limitation is that there is a helical spring means disposed in the space that separates the cover member, which is restrained from moving rearwardly, and the cam portion of the slidable latch, which contacts the roundish bodies that engage the groove.

The court perceives Dethmers's argument to be less about where the spring is located than to be about the absence of the two parts between which the spring is supposed to lie. Thus, Dethmers's argument appears to be that, because the requisite parts are absent, the helical spring in the Dethmers tow bar does not lie "between" them.

◼ **i. *Claim interpretation and literal infringement.*** Considering here only the presence or absence of a "medially-located carn," the court finds first that the '166 patent does not define "cam" in "some clear special" way. *Enercon GmbH,* 151 F.3d at 1384–85; *Vitronics,* 90 F.3d at 1582; *Athletic Alternatives,* 73 F.3d at 1578. Thus, the court must resort to the "ordinary meaning" of the term. *Enercon GmbH,* 151 F.3d at 1384–85; *Vitronics,* 90 F.3d at 1582; *Athletic Alternatives,* 73 F.3d at 1578. A "cam" is

a "rotating or sliding piece in a mechanical linkage used esp[ecially] in transforming rotary motion into linear motion or vice versa." *See, e.g.,* WEBSTER'S COLLEGIATE DICTIONARY (10th ed.). Part 84 in figures 4a, 4b, 6a, and 6b literally fits within this definition, because it is a sliding piece that converts linear motion along the longitudinal axis of the telescoping arms of the tow bar into linear motion in a perpendicular direction, *i.e.,* "radially" inward and outward from the longitudinal axis of the inner tube, to push the locking balls or members into locking position in the groove.

This is not to say, however, that the EXCALI–BAR literally infringes limitation (E) of claim 1 of the '166 patent. The limitation in question consists of the entire expression "helical spring means . . . between the cover member and the slidable latch member medially-located cam portion." *See Enercon GmbH,* 151 F.3d at 1384 ("To establish literal infringement, a plaintiff must demonstrate that every limitation in the claim is literally met by the accused device."); *accord Strattec Security Corp.,* 126 F.3d at 1418 (stating that literal infringement of a claim exists when every limitation recited in the claim is found in the accused device). The court finds that, as a matter of law, the helical spring in the Dethmers tow bar, shown in figures 4a, 4b, 6a, and 6b as part 94, is not "between" the "cam" and any "cover," but between the "cam" and part 66, which is not a "cover," but a part between the "cam" and the inner tube. In short, there is no "cover" apart from the "cam" itself. Thus, the entire limitation of the claim is not present and the EXCALI–BAR tow bar does not literally infringe claim 1 of the '166 patent.

◼ **ii. *"Equivalents" infringement and estoppel.*** Therefore, the court turns to the question of whether Dethmers is entitled to summary judgment on the ground that its tow bar does not infringe this limitation of claim 1 of the '166 patent under the doctrine of equivalents. The court finds that the

---

**14.** Dethmers also contends that its tow bar does not have a "cover," an argument that the court will consider below.

placement of the spring means on the EX-CALI–BAR is an "equivalent" to this limitation of the '166 patent, because, as Automatic argues, " 'the substitute element matches the function, way, and result of the claimed element,' " and plainly does not " 'play[ ] a role substantially different from the claimed element.' " *Tronzo*, 156 F.3d at 1160 (quoting *Warner–Jenkinson*, 520 U.S. 17, 117 S.Ct. at 1054); *Comark Communications, Inc.*, 156 F.3d at 1188–89; *Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1315. The function of the spring itself in the '166 patent appears to be to push the "cam" into locking position, which in turn pushes the engagement devices or balls into the groove on the inner tube, and to retain the cam there, while the function of placement of the spring "between" two other elements appears to be to keep it free of debris; the way in which these functions are performed is to place the spring where, in extended form, it pushes the "cam" (or equivalent member) into the locking position, and to cover the spring to keep it free of debris; with the result that the engagement devices or balls are pushed into the groove on the inner tube and the internal parts of the latch are protected from debris. Indeed, Dethmers once again has not argued otherwise, instead founding its motion for summary judgment of non-infringement of this limitation under the doctrine of equivalents on the unavailability of that doctrine by reason of prosecution history estoppel.

Dethmers asserts that Automatic cannot assert "equivalents" infringement as to this limitation, because Automatic amended this portion of claim 1 to avoid the prior art of the Nikitenko reference. Dethmers describes this as "classic" prosecution history estoppel. Automatic counters that the amendments to this limitation were not to overcome cited prior art, but to clarify the invention, and therefore prosecution history estoppel is inapplicable to the amendment to this limitation. Automatic argues that it would be ludicrous to add limitations identical to those in the Nikitenko reference to attempt to distinguish the prior art. Dethmers responds that Automatic has failed to demonstrate that the change was not in an attempt

to overcome prior art in light of the Examiner's rejection of the limitation, and in the absence of such evidence, Dethmers once again invokes the *Warner–Jenkinson* presumption that the reason was to overcome prior art.

However, the court once again notes that the *Warner–Jenkinson* presumption is not irrebutable. *See Hilton Davis Chem. Co.*, 114 F.3d at 1163 (appellate decision after remand from the Supreme Court remanding to the district court to determine whether the presumption established by the Supreme Court could be rebutted by the patentee). Also, once again, although "an amendment made for reasons other than patentability may still give rise to an estoppel," the court cannot find on this record that there is the necessary "clear and unmistakable surrender" of equivalents to the literal terms of this limitation. *See Litton Sys., Inc.*, 140 F.3d at 1458. Genuine issues of material fact as to the reason for the amendment and its impact on prosecution history estoppel preclude summary judgment on this ground. Therefore, Dethmers' motion for summary judgment of non-infringement must be denied as to this limitation.

#### d. The cover

Finally, Dethmers contends that its EX-CALI–BAR does not have a cover over the trailward portion of its slidable latch member as required by the '166 patent. The pertinent limitation of the '166 patent is the following:

What is claimed is as follows:

1. Arrestably Lockable Telescoping Tow–Bar Assembly comprising:

\* \* \* \* \* \*

(D) a cover having a leading-part slidably surrounding the slidable latch member trailward-part and being directionally trailwardly immovably restrained along the outer-tube[.]

Patent No. '166, claim 1. Dethmers interprets this limitation to require that the cover be over the trailward portion of the slidable latch member and that it be slidable in rela-

tion to that latch member. Dethmers contends that the EXCALI–BAR has no such cover. Automatic does not argue that there is a "cover" on Dethmers's tow bar that literally infringes this limitation, or indeed that portion of the limitation just previously discussed that also relates to the placement of a helical spring in relation to a "cover." Rather, Automatic's entire assertion of infringement as to a "cover" is based on "equivalents." Nonetheless, before considering whether there is "equivalents" infringement of the "cover," the court must construe the claim.

**■ i. Claim interpretation.** The court finds first that the '166 patent does not define "cover" or any of the other terms of this limitation in "some clear special" way. *Enercon GmbH,* 151 F.3d at 1384; *Vitronics,* 90 F.3d at 1582; *Athletic Alternatives,* 73 F.3d at 1578. Thus, the court must resort to the "ordinary meaning" of the terms. *Enercon GmbH,* 151 F.3d at 1384; *Vitronics,* 90 F.3d at 1582; *Athletic Alternatives,* 73 F.3d at 1578. The court interprets the limitation to involve "a cover," *i.e.,* a separate part, that has "a leading-part slidably surrounding the slidable latch member trailward-part," *i.e.,* that is movable in relation to the latch member, and that is "directionally trailwardly immovably restrained along the outer-tube," *i.e.,* that is limited or stopped in its movement toward the trailward portion of the latch member by some means. Here, the description of the "cover" provides some insight, when read in relation to the numbered illustration in Figure 2 of the '166 patent, which appears on page 11 of this opinion. *See Comark Communications, Inc.,* 156 F.3d at 1186 ("Proper claim construction requires an examination of the claim language, *the written description,* and, if relevant, the prosecution history"; emphasis added). It provides that

> [t]here is a cover member **50** having a longitudinally extending leading part **51** that always slidably surrounds the slidable latch trailward-part **42** and *which cover member is directionally longitudinally immovable along outer-tube **30**. In the latter vein, cover member **50** might have an upright portion **52** (depending from*

*leading part **51**) and abutting against said shoulder portion **34S**.*

Patent No. '166, col. 3 (emphasis added). Thus, the "cover" is restrained by some means from moving "trailward," as in the example given in the description, by the trailward portion of the cover encountering a "shoulder" or other impediment on the outer tube.

**■ ii. "Equivalents" infringement and vitiation of claim limitations.** Dethmers asserts that there is no "cover" and no equivalent of a "cover" in its EXCALI–BAR tow bar, and that any "equivalent" is precluded by the rule that assertion of the doctrine of equivalents is barred where to apply the doctrine would "vitiate" the claim limitation. *See Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. at 1049. Automatic asserts that the Dethmers tow bar has an equivalent in that the structure identified as 84 in figures 41, 4b, 6a, and 6b on 28 and 29, respectively, plays the same role as that of the claimed element, keeping debris out of the latching mechanism; this function is accomplished in the same way, by completely covering the interior of the latching mechanism; with the same result, protection of the interior of the latching mechanism. Automatic asserts that structure 84 corresponds to both the "cam" and the "cover" of claim 1 of the '166 patent, and that more than one claim limitation may be present in a single infringing element, citing *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.,* 16 F.3d 394, 398 (Fed.Cir.1994). Dethmers contends that Automatic has misapplied *Dolly,* because the court in that case held that when the limitations themselves require separate elements, using the doctrine of equivalents to cover such devices results in vitiation of a claim limitation. *Id.* at 399–400.

"If a theory of equivalence would vitiate a claim limitation, ... then there can be no infringement under the doctrine of equivalents as a matter of law." *Tronzo,* 156 F.3d at 1160 (citing *Warner–Jenkinson Co.,* 520 U.S. 17, 117 S.Ct. at 1049, 1053 n. 8, but finding no equivalence). A more thorough discussion of the "vitiation" rule, including discussion of *Dolly* upon which the parties

rely, is found in *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1316–21 (Fed.Cir.1998). There, the court appeared to treat the "vitiation" rule as a corollary of the "All Elements" rule, *see Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1317, which this court discussed briefly above at page 110 as a curb on over-expansive application of the doctrine of equivalents.[15]

In *Ethicon*, the district court had held that Ethicon's argument for equivalents infringement would read limitations out of the patent. *See id.* at 1316. The appellate court discussed this conclusion in detail:

> To support its conclusion, the court relied on this court's opinions in *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 29 USPQ2d 1767 (Fed.Cir.1994), and *Wiener v. NEC Electronics, Inc.*, 102 F.3d 534, 41 USPQ2d 1023 (Fed.Cir.1996). More specifically, the court relied on our statements that "[t]he doctrine of equivalents is not a license to ignore the claim limitations," *Dolly*, 16 F.3d at 398, 29 USPQ2d at 1769, and "[t]he protection of a patent may not 'embrace a structure that is specifically excluded from the scope of the claims.'" *Wiener*, 102 F.3d at 541, 41 USPQ2d at 1028 (quoting *Dolly*, 16 F.3d at 400, 29 USPQ2d at 1771). The court found the claim limitations to be in effect specific exclusions of all other subject matter. In its argument before this court, USSC found additional support for the district court's decision in our more recent opinion in *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 44 USPQ2d 1103 (Fed. Cir.1997), which stated that "the doctrine of equivalents does not grant [a patentee] license to remove entirely [any of the] limitations from the claim." *Sage*, 126 F.3d at 1424, 44 USPQ2d at 1106 (citing *Warner–Jenkinson, Pennwalt,* and *Dolly* ).

Ethicon argues that the district court's reliance on *Dolly* and *Wiener*, as well as

USSC's reliance on *Sage,* is misplaced because those cases are factually distinguishable, and in any event no language in claim 6 "directly addresses and specifically excludes" a lockout positioned as in USSC's staplers. Ethicon also argues that the statements relied upon by the district court and USSC, if read broadly, would thoroughly undermine the doctrine of equivalents and specifically contradict *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1259, 9 USPQ2d 1962, 1968 (Fed.Cir.1989) ("An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component, although that is generally the case."). . . .

The discussion of our case law by both parties, as well as the district court, requires that we place the cited decisions in perspective, as well as in the context of *Warner–Jenkinson.* We agree with Ethicon that, if read as argued by USSC, the above-quoted statements from *Dolly, Wiener,* and *Sage* would force the All Elements rule to swallow the doctrine of equivalents, reducing the application of the doctrine to nothing more than a repeated analysis of literal infringement. Once a negative determination of literal infringement is made, that failure to meet a limitation would preclude a finding of infringement under the doctrine. The doctrine of equivalents would thus be rendered superfluous under USSC's view, because a finding of non-infringement would be foreordained when a court has already found that the accused subject matter does not literally fall within the scope of the asserted claim. However, any analysis of infringement under the doctrine of equivalents necessarily deals with subject matter that is "beyond," "ignored" by, and not included in the literal scope of a claim. Such subject matter is not necessarily

<hr/>

**15.** The court in *Ethicon* also opined that the "All Elements" rule was more properly called the "All Limitations" rule, and therefore referred to it by that name throughout much of the opinion. *See Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1317 n. *. Although the court in *Ethicon* recognized that

the "All Limitations" or "All Elements" rule was a curb on the doctrine of equivalents, the court also cautioned that the "All Elements" rule must not swallow the doctrine of equivalents, either. *Id.* at 1317.

"specifically excluded" from coverage under the doctrine unless its inclusion is somehow inconsistent with the language of the claim. Literal failure to meet a claim limitation does not necessarily amount to "specific exclusion." *Cf. Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581, 1582–83, 37 USPQ2d 1365, 1372, 1373–74 (Fed.Cir.1996) (holding that a device "with only two offset distances" was "specifically excluded from the scope of the claim[ ]" because the claim had been construed to include "the limitation that the ... offset distance take on at least three values").

*Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1316–17. The court then considered the reasoning and holdings in *Dolly, Wiener,* and *Sage* in turn. *Id.* at 1317–18. The court reached the following conclusion:

> *Dolly, Wiener,* and *Sage* were decided on their facts, and were consistent with both our precedent and with the Supreme Court's recent express adherence to the doctrine of equivalents as a viable alternative to literal infringement. *They simply explained that on the facts presented, no reasonable finder of fact could have found infringement by equivalents because the differences between the allegedly infringing devices and the claimed inventions were plainly not insubstantial. See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) ("What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case."). *But they did not read the doctrine of equivalents out of existence when a claim limitation is not expressly met by an accused device.*

*Ethicon Endo–Surgery, Inc.*, 149 F.3d at 1318 (emphasis added). After conducting a similar fact-based analysis in the case before it, the court concluded that the differences in placement of a lockout on a stapler between the accused device and the patented invention was also "not insubstantial," and consequently the district court properly granted summary judgment on the ground that there was no "equivalents" infringement. *Id.* at 1318–19.

Here, the court finds that there are genuine issues of material fact as to whether the limitation defining a separate "cover" in a specific relationship to a "cam" and "helical spring" "specifically excluded" an equivalent in which the functions of the "cover" and "cam" are combined in a single element, as they are in element 84 of the accused device. *See id.* at 1317. These genuine issues of material fact arise primarily from the context of the prosecution of the patent leading to the present language of this limitation of claim 1. There are also genuine issues of material fact as to whether structure 84 is an equivalent of this limitation, because this court cannot find that "no reasonable fact finder could [find] equivalence," when the court considers either the function, way, and result of the allegedly corresponding elements or whether their differences are "insubstantial" or "not insubstantial." *See id.* at 1318–19 (concluding that this was the basis on which the *Dolly, Wiener,* and *Sage* decisions reached their conclusions). Thus, the court cannot render summary judgment in favor of Dethmers on either equivalents infringement or vitiation of a claim limitation by application of the doctrine of equivalents as to infringement of this limitation of claim 1 of the '166 patent. These questions properly belong to a jury.

### 4. Summary

In summary, as to Dethmers's motion for summary judgment or partial summary judgment, the court concludes, first, that the court cannot find that either anticipation or obviousness of certain claims has been established beyond dispute where there are genuine issues of material fact as to the nature of the Weasler device upon which those arguments depends. Therefore, the court cannot hold as a matter of law that the '166 patent is invalid on these grounds. Next, the court concludes that genuine issues of material fact preclude summary judgment in Dethmers's favor on its assertion that the '166 patent is unenforceable owing to inequitable conduct by Automatic in prosecution of the patent.

**1044**

Again, genuine issues of material fact as to the materiality of the omitted prior art, the Weasler patent, and the intent to deceive by failing to disclose that prior art, where there are genuine issues of material fact as to the nature of the Weasler device upon which those elements of the argument in part depend. Finally, although the court concludes that the accused device does not literally infringe any of the three limitations of claim 1 of the patent specifically put at issue, the court finds that there are genuine issues of material fact as to whether prosecution history estoppel or some other bar prevents Automatic from asserting "equivalents" infringement. Thus, Dethmers's motion for summary judgment must be denied in its entirety.

### III. CONCLUSION

Upon consideration of the record and the arguments of the parties, the court rules as follows:

1. Automatic's December 5, 1997, motion to dismiss or in the alternative for partial summary judgment, for more definite statement, and to strike is **granted** as to summary judgment on all prayers for punitive damages on state-law claims, but otherwise **denied**.

2. Automatic's March 11, 1998, motion for summary judgment on the invalidity of the Re482 patent is **denied** as to insufficiency of "errors," and assertion that the reissue patent is not for the "same invention" as the original '240 patent, but **granted** as to the inadequacy of the reissue declaration, on the ground that it does not comply with the detail required by the decisions of the Federal Circuit Court of Appeals in *Nupla* and *Constant*, and the former version of 37 C.F.R. § 1.175, and the Re482 patent is hereby declared **invalid**.

3. Dethmers June 2, 1998, motion for summary judgment or in the alternative partial summary judgment on patent invalidity,

unenforceability, and non-infringement is **denied** in its entirety.

**IT IS SO ORDERED.**